**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**February 22, 2021**

**FOR THE TENTH CIRCUIT**
_____

**Christopher M. Wolpert**
**Clerk of Court**

SINCLAIR WYOMING REFINING
COMPANY, a Wyoming corporation,

    Plaintiff - Appellant,

v.

    No. 19-8042

A & B BUILDERS, LTD., a Texas limited
partnership; MATRIX ENGINEERING,
LTD., a Texas limited partnership; HOWE-
BAKER ENGINEERS, LTD., a Texas
limited partnership,

    Defendants - Appellees,


SINCLAIR WYOMING REFINING
COMPANY, a Wyoming corporation,

    Plaintiff - Appellant,

v.

    No. 19-8053

APPLIED CONTROL EQUIPMENT,
LLC, a dissolved Colorado limited liability
company, n/k/a Applied Control
Equipment, LLLP, a Colorado limited
liability partnership; INSTRUMENT &
VALVE SERVICES COMPANY, a
Delaware company; FISHER SERVICE
CO., d/b/a Fisher Controls International,
Inc., a Delaware corporation, n/k/a Fisher
Controls International, LLC, a Delaware
limited liability company; EMERSON
PROCESS MANAGEMENT LLLP, a
Delaware limited liability partnership,

Defendants - Appellees,

and

A & B BUILDERS, LTD., a Texas limited partnership; MATRIX ENGINEERING, LTD., a Texas limited partnership; HOWE-BAKER ENGINEERS, LTD., a Texas limited partnership,

Defendants.

_____

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:15-CV-00091-ABJ)**

_____

Brad W. Breslau, Cozen O'Connor, Denver, Colorado, (Richard R. Rardin, Susan J. Lloyd, Cozen O'Connor, Denver, Colorado; Thomas M. Regan, Cozen O'Connor, San Diego, California; Kevin P. Caraher, Cozen O'Connor, Chicago, Illinois; Geoffrey D. Farnham, Deneberg Tuffley, Southfield, Michigan, with him on the briefs) for Plaintiff – Appellant.

Nicholas A. Merrell, (Bennett J. Lee, Varela, Lee, Metz & Guarino, LLP, San Francisco, California, with him on the brief); Randy L. Sego, (J. Scott Lasater and April D. Moore, Lasater & Martin, P.C. Highlands Ranch, Colorado with him on the brief); Patrick D. McVey, Fox Rothschild LLP, Seattle, Washington, (James F. Bennett, Dowd Bennett LLP, St. Louis, Missouri; Paul J. Hickey, Hickey & Evans, LLP, Cheyenne, Wyoming with him on the brief) for Defendants – Appellees.

_____

Before **MATHESON**, **SEYMOUR**, and **KELLY**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Table of Contents

I.   Background.............................................................................................................2

     A.   Appellees.......................................................................................................2

          1.  CB&I Defendants......................................................................................2

          2.  ACE..........................................................................................................3

          3.  IVS Defendants ........................................................................................3

     B.   Factual Background .......................................................................................3

          1.  The Unit's Origins ...................................................................................3

          2.  Process Design by Fluor Corporation......................................................4

          3.  EPC Contract ...........................................................................................4

          4.  ACE Contract...........................................................................................5

               a. Solicitation of the ACE Contract.......................................................5

               b. Valve inspection by IVS....................................................................7

               c. Design and manufacture of FV-241 .................................................7

          5.  Project Completion ..................................................................................9

          6.  2009 Refinery Fire and Brinell Testing by J.R. Eggleston.................... 10

          7.  2013 Refinery Fire and Explosion ........................................................ 11

     C.   Procedural Background................................................................................. 13

     D.   Legal Background......................................................................................... 15

          1.  Standards of Review .............................................................................. 15

               a. Dismissal under Rule 12(b)(6) ........................................................ 15

               b. Summary judgment under Rule 56.................................................... 16

          2.  Ascertaining Wyoming Law .................................................................. 16

          3.  Wyoming Contract Interpretation Principles......................................... 17

II.  Discussion............................................................................................................ 18

     A.   Claims Against the CB&I Defendants........................................................... 18

          1.  Claim 1 - Breach-of-Contract Claim Against Howe-Baker .................... 19

               a. Additional factual background ........................................................ 19

               b. Analysis .........................................................................................21

                    i.  Howe-Baker was not required to plead a contractual limitations defense 21

                    ii. Article 1.7 bars Sinclair's breach-of-contract claim against Howe-Baker 22

2. Claims 2 and 3 - Sinclair's Negligence Claims Against the CB&I Defendants ..........................................................................................24

    a. Additional legal background ...................................................................25

        i. Economic loss rule ...........................................................................25

        ii. Independent duty doctrine ...............................................................27

    b. Analysis .................................................................................................29

        i. Sinclair has not identified an independent duty ..............................29

        ii. Article 1.7 of the EPC Contract bars Sinclair's negligence claims ...........31

B. CB&I Defendants' Indemnity Counterclaim .....................................................32

  1. The EPC Contract's Indemnity Provisions .................................................33

  2. Analysis .......................................................................................................35

    a. The CB&I Defendants may assert their indemnity counterclaim ................35

        i. Applicable standard .........................................................................35

        ii. Application .....................................................................................40

    b. The EPC Contract requires Sinclair to indemnify the CB&I Defendants .....42

C. The Eggleston Order ...........................................................................................44

  1. Additional Factual and Procedural Background..........................................45

  2. Reviewability of the Eggleston Order .........................................................47

  3. Whether the Eggleston Order was Error......................................................52

    a. Additional legal background ...................................................................52

    b. Analysis .................................................................................................53

D. Claims Against ACE and the IVS Defendants ...................................................56

  1. Claim 4 - Sinclair's Breach-of-Contract Claim Against ACE Based on the Metallurgy Theory ......................................................................................56

  2. Claims 5 and 6 - Sinclair's Negligence and Strict Products Liability Claims Against ACE and the IVS Defendants Based on the Metallurgy Theory ........59

    a. Additional legal background ...................................................................59

    b. Analysis .................................................................................................61

  3. Claim 7 - Sinclair's Failure-to-Warn Claim Against ACE and the IVS Defendants ...................................................................................................63

    a. Sinclair knew before 2013 that FV-241 was made from carbon steel ..........64

        i. Additional legal background ............................................................64

        ii. Analysis ..........................................................................................65

b. Failure-to-warn claim based on FirstVue's limitations ................................. 69

i. Legal standards ................................................................................. 70

ii. Analysis ............................................................................................ 70

4. Sinclair's Remaining Claims Based on the OEM Specifications Theory ........ 72

III. Conclusion ....................................................................................................... 73

On September 27, 2013, a refinery unit ("Unit") at the Sinclair Wyoming Refinery Co. ("Sinclair") in Sinclair, Wyoming caught fire and exploded because its "FV-241" control valve fractured and released flammable hydrogen gas. A high temperature hydrogen attack ("HTHA"), a chemical reaction, weakened the valve and caused the fracture. FV-241 was made from carbon steel, which is more susceptible to HTHA than stainless steel.

Sinclair had purchased the Unit in 2004. Sinclair moved the Unit from California to Wyoming and converted it from its previous use to a hydrotreater, a refinery unit that introduces hydrogen to remove impurities from the product stream. Sinclair contracted the design, engineering, and construction work to other companies. During the moving and conversion process, FV-241 was remanufactured and installed on the Unit. Work on the Unit was completed in 2006.

Following the 2013 explosion and fire, Sinclair brought this diversity action against seven companies involved in dismantling the Unit, converting it to a hydrotreater, rebuilding it in Wyoming, and remanufacturing and installing FV-241. The Defendants, now Appellees, divide into three groups:

1. Howe-Baker Engineers, Ltd. ("Howe-Baker") and its subcontractors, A&B Builders, Ltd. ("A&B") and Matrix Engineering, Ltd. ("Matrix") (collectively, "CB&I Defendants"), which provided construction and field engineering services;

2. Applied Control Equipment, LLC ("ACE"), which contracted with Sinclair to repair, refurbish, or replace valves from the Unit including FV-241; and

3. Emerson Process Management, LLLP ("Emerson"), Fisher Services Co. ("Fisher"), and Instrument & Valve Services Co. ("IVS") (collectively, "IVS

1

Defendants"), which—through ACE—provided valve inspection, repair, and replacement services.

Sinclair alleged various contract and tort claims. The district court granted several motions to dismiss and motions for summary judgment that eliminated all of Sinclair's claims. The court also entered summary judgment in favor of the CB&I Defendants' indemnity counterclaim.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. **BACKGROUND**

The following provides (A) additional information about the three groups of Appellees, (B) factual background, (C) procedural background, and (D) applicable legal standards.

### A. *Appellees*

#### 1. **CB&I Defendants**

The CB&I Defendants consist of Howe-Baker, A&B, and Matrix.[1] Howe-Baker entered into the Engineering, Procurement, and Construction Contract ("EPC Contract") with Sinclair to perform construction and engineering work on the Unit. Howe-Baker subcontracted the construction to A&B and the engineering to Matrix. A&B installed FV-241 on the Unit.

---

[1] CB&I stands for Chicago Bridge & Iron Co., which previously owned the CB&I Defendants. McDermott International, Inc. now owns these businesses.

## 2. **ACE**

ACE contracted with Sinclair (the "ACE Contract") to inspect, repair, and replace valves from the Unit. It coordinated with the IVS Defendants as a parts broker.

## 3. **IVS Defendants**

The IVS Defendants consist of Emerson, Fisher, and IVS. Emerson Electric Co. owns all three.

Through a "Representative Agreement," Emerson appointed ACE as a "sales, engineering, and service representative for" products sold by certain "Emerson Companies," including Fisher. App. at 9541, 9555.

Fisher was the original equipment manufacturer ("OEM") of FV-241. Fisher also developed FirstVue, the software program that ACE used to generate specifications for FV-241.

IVS is a division of Emerson. *Id.* at 9528 (ACE's proposal to Sinclair, which describes "Emerson's Instrument and Valve Service Division"); *id.* at 9561 (Representative Agreement's description of IVS as part of Emerson's Process Systems & Solutions Division). IVS repairs and remanufactures valves. It remanufactured FV-241.

### B. *Factual Background*

The material facts are undisputed unless otherwise noted.

## 1. **The Unit's Origins**

In 2004, Sinclair purchased the Unit, which was then a hydrocracker—a refinery unit that introduces hydrogen at high temperatures and high pressure to "crack" larger hydrocarbon molecules into smaller ones. App. at 1723 (SAC); *id.* at 14,917 (declaration

3

of Bill Walters, Sinclair engineer). Sinclair arranged to dismantle the Unit in California, convert it into a hydrotreater, and rebuild it at its refinery ("Refinery") in Wyoming.

### 2. Process Design by Fluor Corporation

Fluor Corporation ("Fluor"), a nonparty to this action, had provided engineering input for the Unit when it was first constructed in the 1970s or 1980s. Sinclair retained Fluor to help convert the Unit from a hydrocracker to a hydrotreater. Sinclair charged Fluor with preparing a "process design," which yielded detailed specifications for the Unit's conversion. This left some field engineering work to be completed by the CB&I Defendants. App. at 2942-43, 2953, 2960-62.

Sinclair, Fluor, and another firm collaborated to create "piping and instrumentation diagrams" ("P&IDs") for the Unit. *Id.* at 2953-56. Sinclair viewed the P&IDs as "the controlling document[s] for the construction of [the Unit]," akin to a "[B]ible." *Id.* at 2957. Consistent with Fluor's process design, the P&IDs instructed that FV-241 and the line of pipes connected to it should be made from stainless steel. *Id.* at 2956; *id.* at 10,509 (explaining the relationship between Fluor's work and the third firm's work); *see id.* at 2898 (deposition testimony of Albert Gualtieri, Sinclair's Manager of Capital Projects); *id.* at 3106 (Sinclair's admission that Fluor provided specifications that specified metallurgy for the Unit's valves and piping).

### 3. EPC Contract

In February 2005, Sinclair and Howe-Baker entered into the EPC Contract. Howe-Baker subcontracted its construction obligations under the EPC Contract to A&B

4

and its engineering responsibilities to Matrix. Two articles in Part III of the EPC

Contract are particularly relevant.[2]

First, Article 1 (including subsidiary Articles 1.1 to 1.7) sets out Howe-Baker's

guarantees and warranties, creates a warranty claims process for disputes about the

quality of Howe-Baker's work, provides that this process is Sinclair's exclusive remedy

under the EPC Contract, and limits Howe-Baker's liability outside of the process.

Second, Article 28 (including subsidiary Articles 28.1 to 28.4) includes cross-

indemnification provisions applicable to Howe-Baker and Sinclair.

4. **ACE Contract**

a. *Solicitation of the ACE Contract*

The EPC Contract required Sinclair to provide purchased materials and equipment

for the Unit. App. at 1294 (contract amendment). To do so, Sinclair solicited bids for the

inspection and the repair or replacement of the Unit's control valves, including from

ACE. *Id.* at 9541. As part of this solicitation, Sinclair provided a spreadsheet containing

"process information" about the operating conditions each valve would experience after

the Unit's conversion, including:

- the type of liquid the valve would carry (in FV-241's case, hydrogen);

- the viscosity and flow rate of that liquid;

- temperatures; and

---

[2] The EPC Contract refers to its provisions as both "Articles" and "Sections." We refer to its provisions as "Articles" for consistency's sake. Except as otherwise specified, we use the term "Article" to refer to articles in Part III of the EPC Contract.

5

- pressures.

*Id.* at 9513-14 (spreadsheet); *id.* at 9519-20 (deposition testimony of Brian McManus, ACE).

The "process information" for FV-241 said it would carry high-temperature, high-pressure hydrogen. The parties agree this created the risk of HTHA, and FV-241 therefore should have been made from stainless steel, not carbon steel. *See, e.g.*, *id.* at 9306 (declaration of Dr. Bastiaan Cornelissen, Sinclair's retained metallurgy expert); Aplee. CB&I Br. at 13 n.4; Aplee. IVS Br. at 29; Aplee. ACE Br. at 36.

ACE proposed to inspect valves from the Unit and to repair or replace them as necessary. App. at 9526. Its proposal described the "work scope" as follows:

> The initial scope consists of opening and inspecting 68 control valves. After inspection, we will come to you with our best recommendation as to whether it will be more cost effective for you to go ahead and complete the repair (valve is in pretty good shape), rework or replace the trim (valve needs attention), or replace the valve with a newly remanufactured [Fisher] Encore valve (valve is in bad shape.)[.]

*Id.* at 9528.

The proposal also represented that "[a]ll new or [remanufactured Fisher] Encore valves will be run through Fishers [sic] sizing program to guarantee performance in the application specified." *Id.* at 9529. The parties agree that "Fishers [sic] sizing program" referred to FirstVue, the Fisher software program that ACE later used to generate specifications for FV-241.

Sinclair accepted ACE's proposal by placing a purchase order.

6

b. *Valve inspection by IVS*

As coordinated by ACE, IVS received and inspected valves from Sinclair, including "FV-10," FV-241's predecessor on the pre-conversion Unit. IVS noted that FV-10 was made from stainless steel. App. at 9663 ("Customer Repair Report"); *id.* at 9668-69 (deposition testimony of Doug Smith, IVS employee who inspected FV-241). Although FV-10 was in repairable condition, problems with FV-10's serial numbers prevented IVS from verifying that it complied with certain corrosion prevention and control standards. *Id.* at 2811 (declaration of Patrick Reilly, IVS's Rule 30(b)(6) witness); *id.* at 3203-04; 3213-15 (Reilly deposition testimony); *id.* at 9669-70 (Smith deposition testimony). IVS informed ACE about these problems, and ACE—based on its understanding that Sinclair required compliance with those standards—determined that FV-10 should be scrapped and replaced with a compliant valve. *See id.* at 3318 (deposition testimony of Richard "Dick" Edwards, Sinclair employee who corresponded with ACE).

c. *Design and manufacture of FV-241*

ACE then generated a quote and proposed specifications for FV-241 to replace FV-10. When developing specifications for FV-241, ACE did not rely on FV-10's specifications and instead "start[ed] from scratch." App. at 3250 (deposition testimony of Stan Burns, ACE); *accord id.* at 3206-07 (deposition testimony of Patrick Reilly, IVS's Rule 30(b)(6) witness).

To develop the specifications for FV-241, Stan Burns—Sinclair's principal point of contact at ACE—relied on the "process information" in the spreadsheet provided by

7

Sinclair. *Id.* at 3251-52 (Burns deposition testimony); *see id.* at 3231-34 (deposition testimony of Randall Schrader, ACE's Rule 30(b)(6) witness). Mr. Burns focused on supplying a valve having the *mechanical strength* to withstand the temperatures, pressures, and flow conditions to which FV-241 would be subjected. *See id.* at 3241, 3250, 3252 (Burns deposition testimony); *id.* at 9520 (McManus deposition testimony). He did not consider whether the metallurgy of FV-241 was *chemically compatible* with the hydrogen that it would handle. *Id.* at 3256-57. In other words, Mr. Burns focused on whether FV-241 was strong enough to function under certain conditions rather than whether FV-241 was resistant to HTHA or other chemical reactions that could degrade it.

Mr. Burns used FirstVue, the valve sizing software referenced in the ACE Contract, to generate the specifications for FV-241. *Id.* at 3241-42. In November 2005, he provided a quote and proposed specifications for FV-241 to Dick Edwards, his point of contact at Sinclair. Mr. Burns and Mr. Edwards expected that FV-241 would be a remanufactured Fisher "Encore" model carbon steel valve with "integral flanges"— flanges cast onto it as part of the valve body. *Id.* at 13,807 (Edwards deposition testimony); *id.* at 13,812 (quotation); *see id.* at 11,692 (correspondence between Mr. Burns and Mr. Edwards).

IVS did not have in stock a valve core with integral flanges that could be used to remanufacture FV-241. ACE therefore told Sinclair that IVS could make FV-241 by welding flanges onto a valve core with "buttweld ends"—ends that do not have flanges and are tapered so that other components easily can be welded onto them. *Id.* at 11,692 (correspondence between Mr. Burns and Mr. Edwards).

8

In February 2006, Mr. Burns sent another quote and specifications to Mr. Edwards for a version of FV-241 made from a buttweld end valve core with flanges welded onto it. The quote and specifications again described FV-241 as made from carbon steel. *Id.* at 3341 ("WCB Carbon STL Cast"). Sinclair purchased FV-241 from ACE. ACE then issued a purchase order to IVS, which remanufactured FV-241 from an existing carbon steel buttweld end valve core and welded carbon steel flanges onto it.[3] *Id.* at 3218-19.

5. **Project Completion**

Sinclair received FV-241 from IVS in April 2006. App. at 2823 (Sinclair "Incident Investigation" document). FV-241 was marked as made from carbon steel on (1) abbreviations on its actuator tag,[4] (2) cast lettering on the valve body, and (3) imprints on both valve flanges. *Id.* at 2827 ("Incident Investigation" document); *id.* at 17,666 (Sinclair's admissions). A day after Sinclair received FV-241, ACE emailed to Sinclair specification sheets for the Unit's control valves. *Id.* at 3372 (covering email); *id.* at 3103-04 (Sinclair's admission). The specification sheets again said that FV-241 was made from carbon steel. *Id.* at 3394 (specification sheet); *id.* at 3103-04 (Sinclair's admission).

---

[3] The district court held, and the parties do not dispute for the purposes of this appeal, that the ACE Contract consisted of ACE's proposal, Sinclair's purchase order accepting the proposal, and ACE's February 2006 quote for FV-241. App. at 18,309.

[4] This is a tag attached to FV-241's actuator, the component that opened and closed the valve.

9



FV-241 in 2006. The grey portion is the valve body, which is at issue in this litigation. The green portion is an actuator that controls the valve. The actuator is not at issue.

Sinclair did not check FV-241's metallurgy upon receiving it at the Refinery. *Id.* at 2823. Sinclair turned FV-241 over to A&B, which installed it on the Unit. *See id.* at 9317 (Cornelissen expert report).

### 6. **2009 Refinery Fire and Brinell Testing by J.R. Eggleston**

In March 2009, the Unit caught on fire. During a damage assessment, Sinclair removed FV-241 from the Unit because parts of the valve had been visibly damaged. App. at 6629-30.

The parties dispute whether J.R. Eggleston, Sinclair's inspection supervisor at the Refinery, performed Brinell testing—a form of hardness testing—on FV-241 after the 2009 fire. A Brinell test can be used to determine whether carbon steel has been

10

weakened, but it is not an effective way to test the strength of stainless steel. *Id.* at 6581, 6647-67. In July 2017, Mr. Eggleston testified that he performed a Brinell test on FV-241 in 2009 because he knew it was made from carbon steel and not stainless steel. *Id.* After the deposition, he submitted an addendum and errata sheets that retracted his testimony. He also submitted to a second deposition to explain his retractions. As explained later in this opinion, ACE and the IVS Defendants successfully moved to strike the addendum and portions of the errata sheets that retracted Mr. Eggleston's deposition testimony about having performed Brinell testing on FV-241 in 2009.

7. **2013 Refinery Fire and Explosion**

In September 2013, FV-241 fractured on one of its welded-on flanges, "a short distance downstream of the . . . weld" that connected the flange to the valve core. App. at 9320 (Cornelissen expert report); *see id.* at 2823 (Sinclair "Incident Investigation" document). HTHA caused the fracture. Hydrogen gas escaped from the fracture, ignited, and exploded.



Image of FV-241 after it fractured. The right-hand side of the valve is missing its flange.



Close-up image of FV-241 after it fractured. The arrow points to the weld that connected FV-241's valve body to its welded-on flanges.

Sinclair reports damages of approximately $117.35 million:  $48.19 million for repairs and $69.16 million for business interruption.  *Id.* at 10,851-54, 15,073.

Sinclair attributes the failure of FV-241 to two causes:  (1) FV-241 was made from carbon steel instead of stainless steel, making it more susceptible to HTHA ("Metallurgy Theory"); and (2) FV-241's welded-on flanges had a wall thickness thinner than Fisher's OEM specifications ("OEM Specifications Theory").

## C. *Procedural Background*

In the operative second amended complaint ("SAC"), Sinclair asserted seven claims:

1.  Breach of contract against Howe-Baker;

2.  Negligence against the CB&I Defendants;

3.  Negligence of subcontractors against the CB&I Defendants;

4.  Breach of contract against ACE based on the Metallurgy Theory and OEM Specifications Theory;

5.  Negligence against ACE and the IVS Defendants based on the Metallurgy Theory and the OEM Specifications Theory;

6.  Strict products liability against ACE and the IVS Defendants based on the Metallurgy Theory and the OEM Specifications Theory; and

7.  Failure to warn against ACE and the IVS Defendants based on the Metallurgy Theory, and failure to warn that FirstVue could not verify that a valve was made from the correct metallurgy.[5]

---

[5] The district court was unsure whether Sinclair had brought a failure-to-warn claim against ACE and the IVS Defendants based on the OEM Specifications Theory. App. at 18,336 (addressing such a claim "if [Sinclair] raises one").  In its opening brief, Sinclair did not advance this theory as to its failure-to-warn claim.  Aplt. Br. at 73.

Seven of the district court's orders are at issue. The orders addressed motions to dismiss ("MTDs"), motions for summary judgment ("MSJs"), and the motion by ACE and the IVS Defendants to strike changes to Mr. Eggleston's testimony. Through these orders, the district court dismissed or granted summary judgment against all of Sinclair's claims and granted summary judgment in favor of the CB&I Defendants' indemnity counterclaim to require Sinclair to pay their costs of defending this action:

1. A January 2018 order ("CB&I MTD Order") that dismissed Sinclair's negligence claims against the CB&I Defendants under Rule 12(b)(6), App. at 2003;

2. A July 2018 order by the magistrate judge ("Eggleston Order") that struck Mr. Eggleston's addendum to his deposition testimony and struck in part his errata sheets, *id.* at 16,081;

3. A June 2019 order ("Howe-Baker MSJ Order") that granted summary judgment against Sinclair's first claim for breach of contract against Howe-Baker, *id.* at 18,210;

4. Another June 2019 order ("CB&I MSJ Order") that granted summary judgment in favor of the CB&I Defendants' indemnity counterclaim, *id.* at 18,232;

5. Another June 2019 order ("Omnibus Order") that partly granted summary judgment against Sinclair's fourth through seventh claims, *id.* at 18,272;

6. A July 2019 order ("Omnibus Reconsideration Order") that denied Sinclair's motion to reconsider the Omnibus Order, *id.* at 18,590; and

7. An August 2019 order ("IVS Second MSJ Order") that granted summary judgment against Sinclair's remaining claims based on the OEM Specifications Theory, *id.* at 18,843.

After the Howe-Baker MSJ Order and the CB&I MSJ Order issued, the district court entered a judgment as to only the CB&I Defendants under Federal Rule of Civil Procedure 54(b). Sinclair appealed from that judgment. Later, the district court disposed

14

of Sinclair's remaining claims and entered a final judgment. Sinclair appealed from that judgment too.[6] We consolidated the two appeals.

## D. *Legal Background*

The following explains (1) three relevant standards of review, (2) how federal courts ascertain Wyoming law, and (3) Wyoming contract interpretation principles.

### 1. **Standards of Review**

#### a. *Dismissal under Rule 12(b)(6)*

We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim. *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) (citing *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014)). We accept "all well-pleaded factual allegations in the complaint . . . as true," and we view them "in the light most favorable to the nonmoving party . . . ." *Id.* (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006)). A complaint must allege facts sufficient to state a plausible claim for relief on its face—that is, "a plaintiff must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

---

[6] We asked Sinclair to address whether the district court's entry of judgment under Rule 54(b) was proper. Doc. 10663458 at 2-3 (order). After Sinclair responded, the second judgment adjudicated all remaining claims. Because the second judgment was final, any concerns about the first judgment are moot.

b. *Summary judgment under Rule 56*

"We review the grant of summary judgment by the district court de novo, applying the same legal standard to the evidence in the record as did the district court." *Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1314 (10th Cir. 2019) (quotations omitted). In doing so, "[w]e view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party." *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1211 (10th Cir. 2019). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But the "mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient" to create a genuine issue or dispute of material fact. *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068 (10th Cir. 2005) (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1346 (10th Cir. 1997)). To create a genuine issue, "the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant." *Id.*

2. **Ascertaining Wyoming Law**

Federal courts exercising diversity jurisdiction apply the substantive law of the forum state—here, Wyoming. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *McGehee v. Forest Oil Corp.*, 908 F.3d 619, 624 (10th Cir. 2018). When ascertaining Wyoming law, we look first to "the most recent decisions of the state's highest court." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665-66 (10th Cir. 2007). If no controlling decision exists, we must "attempt to predict how the highest court would interpret the issue." *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1164 (10th Cir. 2019) (quotations

16

omitted).  Our predictions may consider appellate decisions in other states with similar

legal principles, federal district court decisions interpreting Wyoming law, and "the

general weight and trend of authority."  *Wade*, 483 F.3d at 666 (citations omitted).[7]  We

do not defer to the district court's interpretation of Wyoming law.  *McGehee*, 908 F.3d at

624.

### 3.  **Wyoming Contract Interpretation Principles**

In Wyoming,

> [the] basic purpose in construing or interpreting a contract is
> to determine the intention and understanding of the parties.  If
> the contract is in writing and the language is clear and
> unambiguous, the intention is to be secured from the words of
> the contract.  And the contract as a whole should be
> considered, with each part being read in light of all other
> parts.

*Mountain W. Mines, Inc. v. Cleveland-Cliffs Iron Co.*, 470 F.3d 947, 951 (10th Cir. 2006)

(quoting *Wyo. Game & Fish Comm'n v. Mills Co.*, 701 P.2d 819, 822 (Wyo. 1985)).

Wyoming courts give contracts their "common sense and plain meaning," and

"[t]he language of a contract is construed in accordance with what a reasonable person

would understand the terms to mean."  *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refin.*

*Sys., Inc.*, 52 F.3d 901, 903 (10th Cir. 1995) (citing *State Farm & Cas. Co. v. Paulson*,

756 P.2d 764, 765 (Wyo. 1988)); *accord Amoco Prod. Co. v. EM Nominee P'ship*, 2 P.3d

534, 540 (Wyo. 2000).  "The contract is to be interpreted by an objective standard and,

---

[7] We treat as persuasive decisions by intermediate courts of appeal in a state.
*Wade*, 483 F.3d at 666 (citations omitted).  But Wyoming does not have an intermediate
court of appeal.

ordinarily, not by the parties' subjective rendition of the contract." *Int'l Surplus Lines Ins. Co.*, 52 F.3d at 903-04 (citing *Shrum v. Zeltwanger*, 559 P.2d 1384, 1387 (Wyo. 1977)). Wyoming courts presume that each contractual provision has a purpose, avoid interpretations that would find contracts internally inconsistent, and resist rendering any provision as surplusage. *See Mantle v. N. Star Energy & Constr. LLC*, 437 P.3d 758, 781 (Wyo. 2019) (collecting decisions).

When contractual language is unambiguous, contract interpretation is a legal question left to the court to decide without resort to extrinsic evidence. *Sutherland v. Meridian Granite Co.*, 273 P.3d 1092, 1095 (Wyo. 2012) (citing *Union Pac. Res. Co. v. Texaco*, 882 P.2d 212, 219-20 (Wyo. 1994)). When contractual language is ambiguous, a court may consider extrinsic evidence. *Id*. In such circumstances, contractual interpretation may become a mixed question of law and fact. *Springer v. Blue Cross & Blue Shield of Wyo.*, 944 P.2d 1173, 1176 (Wyo. 1997). A genuine issue of material fact about contractual meaning may therefore preclude summary judgment.

## II. **DISCUSSION**

We divide our analysis as follows: (A) Sinclair's claims against the CB&I Defendants, (B) the CB&I Defendants' indemnity counterclaim, (C) Mr. Eggleston's testimony, and (D) Sinclair's claims against ACE and the IVS Defendants.

### A. *Claims Against the CB&I Defendants*

This section addresses (1) Sinclair's first claim for breach of contract against Howe-Baker and (2) its second and third claims for negligence and negligence of

18

subcontractors against the CB&I Defendants.  We affirm the district court's dispositions of all three claims.

### 1. Claim 1 - Breach-of-Contract Claim Against Howe-Baker

In the Howe-Baker MSJ Order, the district court granted summary judgment against Sinclair's first claim for breach of contract against Howe-Baker.

We begin with additional factual background about Article 1 of the EPC Contract. We next reject Sinclair's argument that Howe-Baker waived reliance on Article 1 by not pleading a contractual limitations period defense in its answers, and we hold that Article 1.7 bars its breach-of-contract claim against Howe-Baker.

#### a. *Additional factual background*

We review several relevant Articles of the EPC Contract.

First, Article 1.1 describes Howe-Baker's guarantees for design and engineering work.  It states that Howe-Baker will remedy any defects at no cost to Sinclair if it receives written notice of a defect during the warranty period.

Second, Article 1.2 lists Howe-Baker's standards for fabricated equipment and field construction work.  It also states that Howe-Baker will remedy any defects at no cost to Sinclair if it receives written notice of a defect during the warranty period.

Third, Articles 1.4 and 1.5 establish warranty periods and procedures:

> 1.4 Warranty Period:  Contractor's guarantees set forth in
> [Articles] 1.1, 1.2 and 1.3 shall extend for twelve (12) months
> from Mechanical Completion.[8]  Any period wherein the

---

[8] "Mechanical Completion" is a contractual term of art.  App. at 970.  The parties agree that Mechanical Completion occurred in 2006. *Id.* at 18,213 n.1.

19

Work is not available for use and/or is limited in use due to defects in materials, workmanship or engineering furnished by Contractor shall extend the guarantee period by an equal period of time.

1.5 Contractor's Failure to Respond to Warranty Claim: In the event Contractor . . . shall fail to promptly and adequately correct . . . defects, Sinclair shall have the right to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay Sinclair the costs incurred in correcting such defects.

App. at 1263.

Fourth, Article 1.7 includes an exclusive-remedies clause, disclaims any other warranties or guarantees, and limits Howe-Baker's liability:

Limitation: All warranties of any nature made by Contractor [i.e., Howe-Baker] in connection with the work are limited to those set forth in this Article 1. Contractor disclaims all statutory, oral, expressed or implied warranties, including warranties of merchantability or fitness for a particular purpose, and warranties arising from course of dealing or trade usage. Sinclair shall allow Contractor to perform tests and/or remedial services at a mutually agreeable time . . . . *The remedies of Sinclair set forth in this Article 1 constitute Sinclair's sole and exclusive recourse with respect to the quality of the work, and Sinclair shall release contractor from any liability in excess thereof, regardless of Contractor's fault, negligence or strict liability.* Such exclusive remedies shall not be deemed to have failed for their essential service so long as Contractor is willing and able to repair or replace the defective work as prescribed above. Contractor shall have no liability unless notified in writing of a defect within 12 months of Mechanical Completion consistent with the conditions stated in Article 1.0.

*Id.* at 1263 (emphasis added).

Article 1 thus restricts Sinclair from bringing breach-of-contract claims against Howe-Baker because it

20

- states the standards that govern Howe-Baker's performance;

- creates a warranty claims process in case Sinclair discovers a defect in the Unit whereby Sinclair must give written notice to Howe-Baker within a year of Mechanical Completion, and Howe-Baker must remedy any defects at no cost to Sinclair;

- specifies that Article 1's warranty claims process is Sinclair's exclusive remedy as to the quality of work; and

- releases Howe-Baker from any other liability regardless of its fault, negligence, or strict liability.

b. *Analysis*

The district court granted summary judgment to Howe-Baker on Sinclair's breach-of-contract claim. It permitted Howe-Baker to assert a contractual limitations defense despite not pleading one, and held that Article 1 creates a 12-month contractual limitations period that bars Sinclair's breach-of-contract claim against Howe-Baker. App. at 18,220-23, 18,226-27. We affirm on the alternative ground that (i) Howe-Baker was not required to plead a contractual limitations defense because its Article 1 argument is not a contractual limitations defense, and (ii) Article 1.7 bars Sinclair's breach-of-contract claim.

i. Howe-Baker was not required to plead a contractual limitations defense

Sinclair argues that Howe-Baker had to plead a contractual limitations defense to rely on Article 1 to defend against its breach-of-contract claim. It contends the district court erred by permitting Howe-Baker to raise a contractual limitations defense despite not pleading one. This argument is misguided.

21

A contractual limitations period requires a party to bring an action for breach of contract within a certain time period after a breach. *See Plon Realty Corp. v. Travelers Ins. Co.*, 533 F. Supp. 2d 391, 393-94 (S.D.N.Y. 2008) (describing such a provision). The EPC Contract does not include one. The EPC Contract requires Sinclair to notify Howe-Baker about defects within a year of the Unit's Mechanical Completion, but that is not a deadline to bring a breach-of-contract action. Howe-Baker can rely on Article 1.7 to defend against Sinclair's breach-of-contract claim because it limits Sinclair's remedies for defects in the quality of work to the warranty claims process. Put another way, by signing the contract, including the exclusive-remedies and limitation-of-liability clauses, Sinclair waived any right to sue Howe-Baker for breach, and Howe-Baker pled waiver in its affirmative defenses. App. at 1998.

ii. Article 1.7 bars Sinclair's breach-of-contract claim against Howe-Baker

Article 1.7's unambiguous language bars the breach-of-contract claim. Article 1.7 contains (1) an exclusive-remedies clause and (2) a limitation-of-liability clause. It states that "[(1)] the remedies of Sinclair set forth in this Article 1 constitute Sinclair's sole and exclusive recourse with respect to the quality of the work, and [(2)] Sinclair shall release Contractor from any liability in excess thereof, regardless of Contractor's fault . . . ." App. at 1263. Sinclair's breach-of-contract claim against Howe-Baker seeks recourse outside the warranty claims process for the quality of the work performed under the EPC Contract. Article 1.7 plainly bars such a claim.

Sinclair's arguments to the contrary lack force. First, citing a six-page section of its SAC, Sinclair contends it "alleged 31 contractual breaches" and that "[o]nly one of

22

those claimed breaches falls within the guarantees/warranties contained in Article [1]." Aplt. Br. at 39 (citing App. at 1726-31).[9] But Sinclair does not explain or support this argument and has waived it due to inadequate briefing. *See Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2014) ("[A]n appellant may waive an issue by inadequately briefing it."). Sinclair does not explain why these alleged breaches fall outside Article 1's warranty claims process despite appearing to concern the quality of the work performed under the EPC Contract. And it does not point to any evidence supporting the alleged breaches.[10]

Second, Sinclair contends that interpreting Article 1.7 as waiving its breach-of-contract claim against Howe-Baker would be inconsistent with Article 2.3. It points to the following emphasized language:

> 2.3 Sinclair and their representatives, and others as may be required by applicable laws, ordinances and regulations, shall have the right at all reasonable times to inspect the Work and all material, supplies, and equipment for the Work at the jobsite and at Contractor's and its subcontractors' shops for conformance with the Contract. Contractor shall provide, or cause to be provided access and sufficient, safe and proper facilities for such inspections. *Neither the failure to make such inspection nor to discover defective workmanship, materials or equipment, nor approval of or payment to*

---

[9] Depending on how one reads it, the SAC appears to allege either 20 or 32 contractual breaches, not 31. App. at 1726-29.

[10] *MacArthur v. San Juan Cnty.*, 495 F.3d 1157, 1160 (10th Cir. 2007) (quotations omitted) (Rule 28(a)(9)(A) of the Federal Rules of Appellate Procedure "requires the argument section [of an appellant's brief] to contain 'appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.'").

> *Contractor for such Work, materials or equipment shall prejudice the rights of Sinclair.*

App. at 1264.

Sinclair's argument lacks merit. Article 2.3 permits Sinclair and its representatives to inspect the work of Howe-Baker and its subcontractors during their performance. It also states that Sinclair's rights will not be prejudiced by a failure to inspect, by approving work, or by making payments to Howe-Baker. It preserves Sinclair's warranty claims process rights under Article 1.7, but it does not add to them.

Third, Sinclair argues that Article 1.7 does not apply to its breach-of-contract claim against Howe-Baker because Article 1 refers to the "warranties" made by Howe-Baker to Sinclair and does not expressly bar breach-of-contract claims. But Sinclair's breach-of-contract claim falls squarely within the limitation-of-liability and exclusive-remedies clauses in Article 1.7.

\* \* \* \*

In sum, we hold that (1) Howe-Baker was not required to plead a contractual limitations defense to rely on Article 1 of the EPC Contract, and (2) Article 1.7 bars Sinclair's first claim for breach of contract against Howe-Baker. We therefore affirm the district court's grant of summary judgment against Sinclair's first claim.

2. **Claims 2 and 3 - Sinclair's Negligence Claims Against the CB&I Defendants**

In the CB&I MTD Order, the district court dismissed Sinclair's second and third claims against the CB&I Defendants alleging negligence. The court held that (1)

24

Wyoming's economic loss rule and independent duty doctrine and (2) Article 1.7 of the EPC Contract both barred these claims.

Sinclair argues we should reverse these dismissals because its negligence claims are based on duties independent of the EPC Contract, and because Article 1.7 does not bar them. We disagree and affirm.

We explain below Wyoming's economic loss rule and independent duty doctrine and then evaluate Sinclair's arguments. We agree with the district court that Sinclair has failed to identify an independent duty to support its negligence claims. We also agree that Article 1.7 of the EPC Contract independently bars Sinclair's negligence claims.

a. *Additional legal background*

i. Economic loss rule

The economic loss rule bars a party to a contract from using a tort claim to recover contract damages unless the party can show it is owed an "independent duty" in tort creating a separate entitlement to those damages. The rule does not bar a tort claim to recover non-contract damages.

The Wyoming Supreme Court has explained that "[t]he 'economic loss rule' bars recovery in tort when a plaintiff claims purely economic damages unaccompanied by physical injury to persons or property." *Rissler & McMurray Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1234 (Wyo. 1996). It "is 'founded on the theory that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover for damages caused by a breach of the

25

contract.'"  *Id.* at 1235 (quoting *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 374 S.E.2d 55, 58 (Va. 1988)).

Both Wyoming law and the *Restatement (Third) of Torts* recognize the economic loss rule also applies when (1) a contract concerns property, (2) the property is damaged because of negligent performance of that contract, and (3) a party to that contract brings a tort claim to seek compensation for that property damage.  *See Restatement (Third) of Torts:  Liability for Economic Harm* § 3 cmt. c & illustrations (Am. L. Inst. 2020).  For example, the Wyoming Supreme Court has held that when damage caused by a defective purchased product is limited to the product itself and does not extend to persons or other property, the economic loss rule bars recovery in tort and limits the purchaser to a contract claim.  *See Cont'l Ins. v. Page Eng'g Co.*, 783 P.2d 641, 647-49 (Wyo. 1989) (explaining the legal and public policy reasons for this decision, and identifying it as the majority rule); *W. Equip. Co. v. Sheridan Iron Works, Inc.*, 605 P.2d 806, 807 (Wyo. 1980) ("Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction . . . ." (quoting *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 544 P.2d 306, 309-10 (Idaho 1975))).

The Wyoming Supreme Court has applied this principle in the construction context, barring tort claims when property damage is limited to the property at issue in a construction contract.  It has noted that parties to a construction contract have an opportunity to apportion liability regarding that property by mutual assent, and that contract damages are usually sufficient compensation to protect a party's expectation interest in that property.  *See Excel Constr., Inc. v. HKM Eng'g, Inc.*, 228 P.3d 40, 45-46

26

(Wyo. 2010) (apportionment of liability by contract); *Rissler & McMurray Co.*, 929 P.2d

at 1235 (same); *JBC of Wyo. Corp. v. City of Cheyenne*, 843 P.2d 1190, 1197 (Wyo.

1992) (citing *Bowdish v. Johns Creek Assoc.*, 200 Ga. App. 93 (1991)) (contract law

protects expectation interests); *see also Restatement (Third) of Torts:  Liability for

Economic Harm* § 3 cmt. b (explaining the "[r]ationale" for the economic loss rule).

### ii.  Independent duty doctrine

The independent duty doctrine is an exception to the economic loss rule.  *See* Dan

B. Dobbs, Paul T. Hayden & Ellen M. Bublick, Dobbs' Law of Torts § 615 (2d ed. June

2020 update).  Under this doctrine, a party to a contract may maintain a tort claim to

recover contract damages if the claim is "predicated on an independent duty." *Excel

Constr.*, 228 P.3d at 47.[11]

In *Excel Construction, Inc.*, the Wyoming Supreme Court described the

independent duty doctrine:

> Recovery on a tort theory requires a showing that a duty
> independent of contract was violated.  Determining whether a
> particular . . . tort claim is simply a repackaged contract claim
> requires consideration of the conduct alleged, its relationship
> to the contractual duties of the parties, the source of the tort
> duty alleged to have been breached, and the nature of the
> damages claimed.

228 P.3d at 48 (citations omitted).

---

[11] The *Restatement (Third) of Torts* does not use the term "independent duty
doctrine."  Rather, it categorizes the doctrine as "Professional Negligence Resulting in
Economic Loss." *Restatement (Third) of Torts:  Liability for Economic Harm* § 4.

In the construction context, the Wyoming Supreme Court has held that an independent duty can be found in the implied warranty of workmanlike performance:

> In construction contracts, there is an implied warranty that the work will be performed in a skillful, careful, diligent and workmanlike manner. Where negligence on the part of the contractor results in a breach of this warranty, a cause of action ex contractu and a tortious action premised on negligence, or both, are available to the contractee.

*Cline v. Sawyer*, 600 P.2d 725, 732 (Wyo. 1979) (collecting decisions and evaluating a commercial construction contract); *accord Rogers v. Wright*, 366 P.3d 1264, 1275-76 (Wyo. 2016) (citing *Tavares v. Horstman*, 542 P.2d 1275, 1282 (Wyo. 1975)).

As Sinclair appears to acknowledge, Aplt. Br. at 27, 30-31, the Wyoming Supreme Court has held that parties to a contract can agree to waive implied warranties, thereby waiving the independent duty grounded in the implied warranty. *See Rogers*, 366 P.3d at 1277 (contract for purchase of new home from a homebuilder).[12]

---

[12] Both *Rogers* and *Schell v. Scallon*, 433 P.3d 879, 886 (Wyo. 2019), a later case that applied *Rogers*, addressed contracts for the sale of homes and not commercial construction and engineering contracts like the EPC Contract. We believe the Wyoming Supreme Court would recognize that Sinclair could waive any implied warranties in the EPC Contract. It said in *Rogers* that it wished to prevent "purchasers [from ignoring] their negotiated bargain and responsibilities." *Rogers*, 366 P.3d at 1277 (citing *Greeves v. Rosenbaum*, 965 P.2d 669, 673-74 (Wyo. 1998)). Similarly, for commercial construction contracts, the Wyoming Supreme Court has stressed that parties may allocate risks by contract. *E.g.*, *Excel Constr., Inc.*, 228 P.3d at 45-46; *Rissler*, 929 P.2d at 1235. The *Restatement (Third) of Torts* also suggests that sophisticated parties like these businesses can waive independent duties by contract. *Restatement (Third) of Torts: Liability for Economic Harm* § 4 cmt. e.

28

b. *Analysis*

The district court granted summary judgment on Sinclair's negligence claims against the CB&I Defendants because Sinclair waived any independent duty the CB&I Defendants may have owed. App. at 2006-10. On appeal, Sinclair argues that the district court erred because it can identify an independent duty that exempts its negligence claims from the economic loss rule. We disagree. Sinclair's negligence claims fail because (i) Sinclair has not identified an independent duty that supports them, and (ii) Article 1.7 of the EPC Contract bars them.

i. Sinclair has not identified an independent duty

Sinclair argues that an independent duty can be derived from implied warranties in the EPC Contract or from an industry standard called American Petroleum Institute 941 ("API 941"). We are not persuaded.

In its appeal, Sinclair has not argued that its negligence claims fall outside the economic loss rule. It argues only that the CB&I Defendants owed independent duties that exempt its negligence claims from the economic loss rule. Sinclair has therefore conceded that its negligence claims fail unless it can identify an independent tort duty.[13]

Sinclair has not identified one. First, it attempts to locate an independent duty in the warranties that Wyoming law implies in construction contracts. But as the Wyoming

---

[13] Sinclair could have argued on appeal that its negligence claims against the CB&I Defendants fall outside the scope of the economic loss rule because it seeks tort damages for damage to property other than the Unit and associated business interruption. But Sinclair has not made this argument. Even if it had, Article 1.7 of the EPC Contract would bar these claims.

29

Supreme Court held in *Rogers v. Wright*, such implied warranties are contractually waivable. *Rogers*, 366 P.3d at 1275-77. And in Article 1.7, Howe-Baker disclaimed all implied warranties.[14] Sinclair therefore cannot argue there are implied warranties in the EPC Contract that support an independent duty.[15]

Second, Sinclair argues that API 941, an American Petroleum Institute standard concerning metallurgy for control valves and other refinery components, establishes an independent duty. Sinclair argues the Wyoming Supreme Court held in *Rogers v. Wright*

---

[14] Sinclair argues the district court should not have applied Article 1.7 to its negligence claims because the CB&I Defendants did not invoke it. Aplt. Br. at 30-31. We disagree. The CB&I Defendants moved for dismissal because there was no independent duty to support Sinclair's negligence claims. App. at 1769-74. In its response brief, Sinclair tried to meet its burden to identify an independent duty by invoking implied warranties in the EPC Contract. *Id.* at 1825-27. In their reply, the CB&I Defendants argued that Sinclair failed to meet its burden because it waived any implied warranties in Article 1.7, consistent with *Rogers*. *Id.* at 1861-62.

Sinclair also argues that interpreting Article 1.7 to waive implied warranties would render as surplusage Articles 28.1.4, 28.4, 50.0, and 51.0. Aplt. Br. at 34. We are unpersuaded. As the district court observed, Articles 28.1.4, 50, and 51 would still have effect if Howe-Baker failed to meet its responsibility under the warranty claims process created by Article 1. App. at 18,228. The same principle applies to Article 28.4. Sinclair does not address the district court's reasoning on appeal.

[15] Sinclair also attempts to differentiate the subcontractors, A&B and Matrix, from Howe-Baker, arguing that it did not expressly agree to waive any implied warranties made by A&B and Matrix. Aplt. Br. at 35-36. But in the construction context, the Wyoming Supreme Court has held that implied warranties emanate from construction contracts. *E.g.*, *Cline*, 600 P.2d at 732 ("In construction contracts, there is an implied warranty . . . ."). Because A&B and Matrix were not parties to the EPC Contract, the EPC Contract cannot create implied warranties made by A&B and Matrix to Sinclair. *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718-19 (Tex. 2014) (reaching a similar conclusion under Texas law). And in any case, as we explain later in this opinion, the exclusive-remedies clause in Article 1.7, which is not limited to Howe-Baker, otherwise bars Sinclair's negligence claims against A&B and Matrix.

30

that industry standards necessarily give rise to independent duties, and that API 941 is a widely accepted industry standard. Aplt. Br. at 29-30 (citing *Rogers*, 366 P.3d at 1276). But Sinclair overreads *Rogers*, which merely described a South Carolina Supreme Court ruling that "recognized a legal duty of a [new home] builder to comply with building codes and industry standards." *Rogers*, 366 P.3d at 1276 (citing *Kennedy v. Colum. Lumber & Mfg. Co.*, 299 S.C. 335 (1989)). *Rogers* does not support Sinclair's position that an industry standard necessarily gives rise to an independent duty between contracting parties.

Sinclair thus has failed to identify an independent duty that supports its negligence claims.

### ii. Article 1.7 of the EPC Contract bars Sinclair's negligence claims

Even if Sinclair's negligence claims arose from an independent duty, the exclusive-remedies provision in Article 1.7 of the EPC Contract would bar them. The provision states, "The remedies of Sinclair set forth in this Article 1 constitute Sinclair's sole and exclusive recourse with respect to the quality of the work . . . ." App. at 1263. Sinclair's negligence claims concern the quality of the work performed under the EPC Contract. Sinclair argues the work was substandard because FV-241 was installed on the Unit and caused its failure. The warranty claims process set out in Article 1 is Sinclair's exclusive recourse for such matters.

Sinclair argues that Article 1.7 applies only to Howe-Baker and not its subcontractors. It correctly observes that the release-of-liability clause in Article 1.7 is limited to Howe-Baker. (". . . Sinclair shall release [Howe-Baker] from any liability in

31

excess thereof, regardless of [Howe-Baker's] fault, negligence or strict liability.") But the exclusive-remedies clause in Article 1.7 contains no such limitation. ("The remedies of Sinclair set forth in this Article 1 constitute Sinclair's sole and exclusive recourse with respect to the quality of the work . . . .") The EPC Contract defines "work" broadly to encompass all work performed under the EPC Contract. *See id.* at 970 (Part I, Article 1.0 of the EPC Contract, defining "Work"); *id.* at 981 (scope of work includes sending valves 2 inches and larger to Sinclair and installing and/or reinstalling valves supplied by Sinclair). And the EPC Contract, many of its schedules, and many of its attachments contemplate that the "work" will be performed by both Howe-Baker and its subcontractors. Read plainly and in concert with the rest of the EPC Contract, the exclusive-remedies provision in Article 1.7 of the EPC Contract extends to A&B and Matrix.

\*　　\*　　\*　　\*

Sinclair has conceded that its negligence claims against the CB&I Defendants fail unless it can identify an independent tort duty. It has not identified one. Article 1.7 of the EPC Contract also bars Sinclair's negligence claims. We therefore affirm the district court's dismissal of Sinclair's second and third claims against the CB&I Defendants alleging negligence.

### B. *CB&I Defendants' Indemnity Counterclaim*

In the Howe-Baker MSJ Order, the district court held that Sinclair must indemnify the CB&I Defendants for their costs of litigation. Sinclair appeals, arguing that (1) the CB&I Defendants waived their indemnity counterclaim by pleading it in their answer to

32

Sinclair's original complaint and then failing to replead it in their answers to Sinclair's two amended complaints, and (2) the district court erred in finding that the EPC Contract requires Sinclair to indemnify the CB&I Defendants. We reject these arguments and affirm.

We first present the EPC Contract's indemnity provisions. We then determine that the CB&I Defendants may assert their indemnity counterclaim notwithstanding their failure to replead it in their answers to Sinclair's amended complaints. Finally, we turn to the merits and affirm the district court's determination that Sinclair must indemnify the CB&I Defendants for their litigation costs.

1. **The EPC Contract's Indemnity Provisions**

Article 28 of the EPC Contract contains cross-indemnity provisions. The following provisions are relevant:

> 28.1 Contractor agrees to defend, indemnify, and hold harmless Sinclair . . . from and against any claim, demand, cause of action, liability, loss or expense, arising:
>
> 28.1.1 By reason of Contractor's actual failure to comply with any law, ordinance, regulation, rule or order, or with this Contract. . . .
>
> ***
>
> **28.1.4 FROM DAMAGE TO OR LOSS TO THE PROPERTY OF SINCLAIR . . . ARISING DIRECTLY OR INDIRECTLY OUT OF THIS CONTRACT, TO THE EXTENT CAUSED BY THE NEGLIGENCE OF CONTRACTOR OR ITS SUBCONTRACTORS, BUT SUCH LIABILITY SHALL NOT EXCEED TEN MILLION DOLLARS ($10,000,000) TOTAL CUMULATIVE LIABILITY, PER OCCURRENCE AND IN THE AGGREGATE.**

\*\*\*

28.2 Contractor's indemnity obligations shall apply regardless of whether the party to be indemnified was concurrently negligent, whether active or passively, excepting only where the injury, loss or damage was caused by the gross negligence or willful misconduct of, or by defects in design furnished by, the party to be indemnified, or as otherwise provided in [Article] 28.3.  Contractor's defense and indemnity obligations shall include the duty to reimburse any attorneys' fees and expenses incurred by Sinclair for legal action to enforce Contractor's indemnity obligations and Sinclair obtains a favorable judgment with respect thereto.

28.3 Sinclair agrees to defend, indemnify and hold harmless Contractor, its subcontractors and their respective affiliated companies and all of their directors, officers, employees, agents and representatives ("Contractor's Indemnified Parties"), from and against any claim, demand, cause of action, liability, loss or expense arising:

28.3.1 By reason of Sinclair's actual failure to comply with any law, ordinance, regulation, rule or order, or with this Contract.  This [Article] 28.3.1 includes, but is not limited to, fines or penalties by government authorities and claims arising from Sinclair's actual or asserted failure to pay taxes.

\*\*\*

**28.3.4 FROM DAMAGE TO OR LOSS OF THE PROPERTY OF SINCLAIR . . . ARISING DIRECTLY OR INDIRECTLY OUT OF THIS CONTRACT, HOWSOEVER SUCH DAMAGE OR LOSS SHALL OCCUR, INCLUDING THE FAULT OR CONCURRENT OR SOLE NEGLIGENCE (ACTIVE OR PASSIVE) OF CONTRACTOR OR CONTRACTOR'S INDEMNIFIED PARTIES, EXCEPT AS PROVIDED IN [ARTICLE] 28.1.4.**

\*\*\*

28.4 Sinclair's indemnity obligations shall apply regardless of whether the party to be indemnified was concurrently or solely negligent (active or passive).  Sinclair's defense and

34

> indemnity obligations shall include the duty to reimburse any attorneys' fees and expenses incurred by Contractor for legal action to enforce Sinclair's indemnity obligations and Contractor obtains a favorable judgment with respect thereto.

App. at 1278-80 (bold typeface and all caps in original; asterisks indicate omitted paragraphs).

### 2. Analysis

We hold the CB&I Defendants may assert their indemnity counterclaim notwithstanding their failure to replead it in their answers to Sinclair's amended complaints. We further hold that the EPC Contract requires Sinclair to indemnify the CB&I Defendants for their litigation costs.

#### a. *The CB&I Defendants may assert their indemnity counterclaim*

The CB&I Defendants may pursue their indemnity counterclaim because Sinclair cannot show prejudice from their failure to replead it in their answers to the amended complaints.

##### i. Applicable standard

The Federal Rules of Civil Procedure do not specifically address whether a defendant that fails to replead a counterclaim in response to an amended complaint may continue to assert that counterclaim. We have not addressed this issue, and the few courts that have are divided.[16]

---

[16] *See e.g.*, *Comprehensive Mfg. Assocs., LLC v. SupplyCore, Inc.*, No. 3:15-CV-0835 (TJM-DEP), 2017 WL 2693508, at *3 (N.D.N.Y. May 24, 2017) (collecting cases and noting that courts are divided); *Cario Marine Serv., Inc. v. Homeland Ins. Co. of N.Y.*, No. 4:09CV1492 CDP, 2010 WL 4614693, at *1 & n.2 (E.D. Mo. Nov. 4, 2010)

Some courts have held that a counterclaim to an original complaint falls away unless it is repleaded in later answers to amended complaints. *See, e.g.*, *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 277 n.3 (3d Cir. 2019) (unpublished) (holding that the Federal Circuit did not have exclusive appellate jurisdiction over an appeal because the defendant did not replead its patent counterclaims in its amended answers, and the counterclaims therefore had no legal effect); *Johnson v. Berry*, 228 F. Supp. 2d 1071, 1079 (E.D. Mo. 2002). The rationale is that an amended answer supersedes previous answers, "render[ing]" them "of no legal effect." *Par Pharm., Inc.*, 764 F. App'x at 277 n.3 (quoting *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013)).

But other courts have been more flexible, permitting a defendant to pursue its counterclaim unless the plaintiff shows that the failure to replead it caused prejudice. For example, in *Hughes v. Abell*, 867 F. Supp. 2d 76 (D.D.C. 2012), the court characterized the plaintiff's argument that an amended answer that omitted counterclaims nullified previously pleaded counterclaims as having "some force":

> Federal Rule of Civil Procedure 7 states that "[o]nly these pleadings are allowed" and then sets forth a list of pleadings that does not include counterclaims. Rule 13 requires that a counterclaim be set forth in a pleading. It would be reasonable to conclude from these two rules that a counterclaim is not a distinct pleading, but rather must be included as part of another pleading, such as an answer. And it is certainly true that "[o]nce an amended pleading is interposed, the original pleading no longer performs any

(same); 1 Steven S. Gensler & Lumen N. Mulligan, Federal Rules of Civil Procedure, Rules and Commentary r.15 (Feb. 2020 update) (same).

36

> function in the case." 6 Charles A. Wright, et al., Fed. Prac. & Proc. Civ. § 1476 (3d ed.). Accordingly, it is reasonable for [the plaintiff] to assert that when [the defendant] replaced its answer with an answer that did not contain counterclaims, the pleading that was before the Court (the new answer) did not contain counterclaims.

*Id.* But the court said "this conclusion would put form over substance." *Id.* It characterized counterclaims as distinct from defenses, admissions, and denials:

> An answer and a counterclaim, even if contained in the same document, serve different functions; the counterclaim shares more with a complaint, setting out claims against the other party, than it does with the answer. *See Dunkin' Donuts Inc. v. Romanias*, 2002 WL 32955492, at *1–2, 2002 U.S. Dist. LEXIS 28405, at *5–6 (W.D. Pa. May 29, 2002). . . . It is not especially intuitive that a counterclaim is part of the pleading to which it is attached, nor is it obvious that counterclaims must be re-pled when an answer with counterclaims attached is superseded.

*Id.*

The court permitted the defendant to continue asserting its counterclaims because the plaintiff did not show that the defendant's failure to replead caused prejudice or led the plaintiff to believe that the counterclaims had been abandoned. *Id.*

The Eighth Circuit in *Davis v. White*, 794 F.3d 1008 (8th Cir. 2015), reached a similar conclusion. There, despite failing to replead his counterclaim in his answer to an amended complaint, the defendant continued to press the counterclaim in discovery responses, defense counsel continued to describe the defendant as a counterclaimant, and the plaintiff continued to acknowledge that he was a counterdefendant. *Id.* at 1015. The court said:

The Federal Rules of Civil Procedure clearly give a district court discretion to grant or deny a motion to deem a counterclaim abandoned [when a defendant fails to include it in their answer to an amended complaint]. Rule 15(a)(3) provides that, "*[u]nless the court orders otherwise,* any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later" (emphasis added). Rule 15(a)(2) provides that the district court "should freely give leave [to amend] when justice so requires." Though Rule 13(a)(1) requires that a compulsory counterclaim be stated in "a pleading," that term was used to clarify that counterclaims could be asserted in pleadings other than "the answer." *See* 6 Wright, Miller & Kane, *Federal Practice and Procedure* § 1401, at 6–7 (3d ed. 2010). Rule 1 requires that the Federal Rules "be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Where, as here, plaintiff is given sufficient notice that defendant is continuing to pursue a compulsory counterclaim, and plaintiff would not be unfairly prejudiced if the counterclaim proceeds, an inflexible rule that counterclaims are always abandoned if not repleaded would not serve the interests of justice. *See Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 706 (D. Md. 2011).

*Id.* at 1015-16.

We find *Hughes* and *Davis* persuasive because the Federal Rules do not speak clearly about whether counterclaims must be repleaded in subsequent answers, counterclaims are distinct from other parts of an answer, and an inflexible rule would not serve the interests of justice.[17] *Hughes* and *Davis* allowed a defendant that failed to

---

[17] As in *Hughes*, we have said "[a]n amended pleading supersedes the pleading it modifies and remains in effect throughout the action unless it subsequently is modified." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1180-81 (10th Cir. 2015) (quotations omitted).

38

replead a counterclaim in subsequent answers to continue to assert that counterclaim unless the plaintiff could show he would suffer prejudice. A key consideration is whether the plaintiff had notice that the defendant intended to continue pursuing the counterclaim.

This prejudice-based approach finds further support in Rule 15. When a district court decides whether to grant leave to amend under Rule 15(a)(2), it focuses principally on prejudice: "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir 1993)). Likewise, when a district court decides whether to permit a pleading to be amended over an opposing party's objection under Rule 15(b)(1), its inquiry also focuses mainly on prejudice. *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1232 (10th Cir. 2017) (citing *Green Country Food Mkt., Inc. v. Bottling Grp.*, 371 F.3d 1275, 1280-81 (10th Cir. 2004)).[18]

---

[18] Unless the plaintiff suffers prejudice, Rule 15(b)(1) authorizes a district court to allow a defendant to conform its pleadings to the evidence and advance new counterclaims at trial—sometimes even over the plaintiff's objection. Fed. R. Civ. P. 15(b)(1); *see* 6A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1492 (3d ed. Oct. 2020 update) [hereinafter Wright & Miller]. We have applied Rule 15(b) in this manner at summary judgment. *Ahman v. Furlong*, 435 F.3d 1196, 1203 n.1 (10th Cir. 2006) (observing that we have done so but recognizing a circuit split on the issue). If a district court can consider counterclaims that were never pled, it is reasonable, absent prejudice, to permit a district court to consider counterclaims that were once pled and not repleaded.

We agree with the Eighth Circuit that "an inflexible rule that counterclaims are always abandoned if not repleaded would not serve the interests of justice." *Davis*, 794 F.3d at 1016.[19] Applying such a rule "would put form over substance." *Hughes*, 867 F. Supp. 2d at 91. We hold that when a defendant pleads a counterclaim in an answer but fails to replead that counterclaim in subsequent answers, it may continue to pursue the counterclaim unless the plaintiff shows that the failure to replead it caused prejudice.

This leaves the question of what standard of review we should apply to a district court's decision to permit or bar a defendant from raising a counterclaim that it failed to replead. We hold the appropriate standard of review is abuse of discretion because we apply that standard in the analogous Rule 15 context. *Bylin*, 568 F.3d at 1229 (Rule 15(a)(2)); *Green Country Food Mkt.*, 371 F.3d at 1280 (Rule 15(b)).

ii. Application

Applying this standard here, we conclude the district court did not abuse its discretion by concluding that the CB&I Defendants' failure to replead their indemnity counterclaim did not prejudice Sinclair. The court properly allowed the CB&I Defendants to continue asserting their indemnity counterclaim.

Sinclair received notice that the CB&I Defendants intended to continue pressing their indemnity counterclaim. They alleged two counterclaims and one crossclaim in their first answer, including their indemnity counterclaim. App. at 70-78. The CB&I

---

[19] A flexible approach also avoids harsh results for a defendant-counterclaimant as to compulsory counterclaims that are barred unless asserted in the pending action.

40

Defendants omitted all three counter/crossclaims from their answers to the first and second amended complaints, instead of selectively omitting one or two of them. *Id.* at 1527-39, 1987-2000. In all three of their answers, the CB&I Defendants labeled themselves as "counterclaimants." *Id.* at 70, 1527, 1987. And in discovery responses postdating their answer to Sinclair's SAC, they stated that one of their affirmative defenses was "offset," which "entitles the CB&I Parties to indemnity from Sinclair as to any damages, attorneys' fees, or costs in connection with the instant dispute." *Id.* at 5874. Finally, after their answer to the first amended complaint but before their answer to the SAC, the CB&I Defendants moved to dismiss their crossclaim without prejudice but did not move to dismiss their counterclaims. *Id.* at 1742. Though not as strong as the procedural record in *Davis*, the foregoing circumstantial evidence was sufficient to notify Sinclair that the CB&I Defendants wished to continue pursuing their indemnity counterclaim.

We reject Sinclair's argument it was prejudiced because "no discovery had been conducted on indemnity." Aplt. Br. at 50. The merits of the indemnity counterclaim concern contract interpretation, and Sinclair has not identified what discovery it would have sought or what facts it would have established with discovery. Notably, Sinclair also did not invoke Federal Rule of Civil Procedure 56(d) to seek additional discovery when opposing the CB&I Defendants' motion for summary judgment on their indemnity counterclaim. App. at 15,019-45.

We conclude the district court did not abuse its discretion in allowing the CB&I Defendants to pursue their indemnity counterclaim.

41

b. *The EPC Contract requires Sinclair to indemnify the CB&I Defendants*

We affirm the district court's summary judgment ruling that the EPC Contract requires Sinclair to indemnify the CB&I Defendants for their litigation costs. We first explain why Howe-Baker owes no indemnity to Sinclair and then address Sinclair's indemnity obligations to the CB&I Defendants. Although we do not discuss every point made by the district court on this issue, we generally agree with its analysis.

Article 28 of the EPC Contract establishes cross-indemnity duties for Howe-Baker and Sinclair when there is damage or loss to Sinclair's property. Although these duties interact in complicated ways, Howe-Baker owes no indemnity to Sinclair under the circumstances here. Article 28.1.4 requires Howe-Baker to indemnify Sinclair for "any claim, demand, cause of action, liability, loss or expense arising from damage or loss to the property of Sinclair . . . arising out of the [EPC Contract]," but only "to the extent caused by the negligence of [the CB&I Defendants]." As we held above, Sinclair failed to identify an independent duty that supports its negligence claims against the CB&I Defendants. Thus, Sinclair cannot contend the "damage or loss to the property of Sinclair . . . arising out of the [EPC Contract]" was caused by the CB&I Defendants' negligence.[20]

---

[20] The CB&I Defendants also argue Howe-Baker has no indemnity obligations to Sinclair because the exclusive-remedies clause in Article 1.7 bars Sinclair from seeking recourse for the quality of the work performed under the EPC Contract outside the warranty claims process. Aplee. CB&I Br. at 48-49. We agree this is a valid additional reason that Howe-Baker owes no indemnity to Sinclair.

This leaves only Sinclair's indemnity obligations to the CB&I Defendants. Articles 28.3 and 28.3.4 require Sinclair to "defend, indemnify, and hold harmless [Howe-Baker] . . . [and] its subcontractors . . . from and against any claim, demand, cause of action, liability, loss or expense arising . . . from damage to or loss of the property of Sinclair . . . arising directly or indirectly out of this contract." Under the plain meaning of these provisions, the CB&I Defendants incurred losses and expenses by litigating this action due to Sinclair's "claim, demand, cause of action" arising from "damage to or loss to the property of Sinclair" arising out of the EPC Contract. We thus affirm the district court's holding that Sinclair is required to indemnify the CB&I Defendants for their costs of defending this action.[21]

Sinclair argues that its indemnity obligations extend only to third-party claims against the CB&I Defendants, and not to claims that Sinclair itself may bring against the CB&I Defendants. We disagree because Article 28 does not expressly limit Sinclair's indemnity obligations to third-party claims. Interpreting Sinclair's indemnity obligations to include claims that Sinclair itself may bring against the CB&I Defendants comports with Article 28 because Sinclair is the party most likely to assert "claim[s], demand[s], cause[s] of action, liability, loss[es] or expense[s]" against the CB&I Defendants arising from "damage to or loss of the property of Sinclair" in relation to the EPC Contract. *See* App. at 18,260.

---

[21] Sinclair's indemnity obligations extend to any losses and expenses incurred in the CB&I Defendants' defense of this appeal because Article 28.3 extends to "any claim, demand, cause of action, liability, loss or expense."

43

We hold that Articles 28.3 and 28.3.4 require Sinclair to indemnify the CB&I Defendants for their costs of defending this action. We affirm the district court's grant of summary judgment in favor of the CB&I Defendants' indemnity counterclaim.

## C. *The Eggleston Order*

Sinclair challenges the magistrate judge's Eggleston Order that denied Sinclair's and Mr. Eggleston's attempt to retract his deposition testimony. At his first deposition, Mr. Eggleston, Sinclair's former inspection supervisor at the Refinery, testified he knew in 2009 that FV-241 was made from carbon steel. He attempted to retract his testimony by submitting an addendum and errata sheets, and he explained his retractions in a second deposition. In the Eggleston Order, the magistrate judge struck these retractions under Federal Rule of Civil Procedure 30(e). We review a district court's decision to strike or exclude testimony for abuse of discretion. *See Sports Racing Servs. v. Sports Car Club of Am.*, 131 F.3d 874, 894 (10th Cir. 1997).

After providing additional background, we reject ACE and the IVS Defendants' arguments that we lack jurisdiction to review the Eggleston Order or that Sinclair waived its right to appeal the order by not objecting to it in district court. Reaching the merits, we hold that the magistrate judge did not abuse his discretion in striking Mr. Eggleston's retractions. We therefore affirm the Eggleston Order.

Resolution of this issue affects Sinclair's seventh claim alleging ACE and the IVS Defendants breached a duty to warn Sinclair about FV-241's carbon steel metallurgy and vulnerability to HTHA. We address the relevance of Mr. Eggleston's testimony to that claim later in this opinion.

44

1. **Additional Factual and Procedural Background**

On July 21, 2017, Mr. Eggleston testified about the damage assessment he performed after the 2009 fire at the Unit. App. at 6636. He testified that he performed Brinell hardness tests on FV-241, which was "involved in [the] heater" that caught on fire. *Id.* at 6644-45. A Brinell hardness test measures "the hardness of a material by pressing a hardened metal ball against the smooth material surface of the item being tested," creating an indent on the material. *Id.* at 6581 (declaration of Dr. Michael E. Stevenson, expert for the IVS Defendants).

Mr. Eggleston explained that Brinell testing could be used to determine the strength of carbon steel, but not stainless steel. *Id.* at 6647-49; *see id.* at 6581 (Dr. Stevenson's declaration, explaining that for certain materials including carbon steel, Brinell testing can be used to determine material strength). He testified that he performed Brinell testing on FV-241 to determine whether it had been weakened by the fire because the valve was made from carbon steel, and that he would not have performed Brinell testing on it if it were made from stainless steel. *Id.* at 6647-49. Mr. Eggleston also identified several parts of FV-241 on which he performed Brinell testing, including on both flanges. *Id.* at 6646, 6661-62, 6667.[22]

In August 2017, Mr. Eggleston submitted an addendum and errata sheets to his deposition testimony. In the addendum, he stated that since his July 21, 2017 deposition,

---

[22] Mr. Eggleston was unable to recall how he reported the results of his testing to others. App. at 6642-43.

45

he had been given an opportunity to examine FV-241, and he had been unable to find signs that he had performed Brinell testing on it. *Id.* at 6781. He recalled that in 2009, he had tested portions of FV-241's "control valve actuator, rather than the body or valve flanges . . . ." *Id.* He stated that he had not tested the valve body in 2009 because, even after the fire, a layer of "block insulation" had remained intact on FV-241. *Id.* Mr. Eggleston and others at Sinclair had concluded in 2009 that because the insulation was intact, FV-241's body and flanges must have been protected from thermal damage. *Id.*

In December 2017, Mr. Eggleston was deposed a second time. He testified that he had inspected FV-241 following his first deposition after Sinclair's counsel suggested he do so. *Id.* at 9164-65, 9166-67. He also explained the bases for his addendum and errata sheets. *Id.*

The IVS Defendants moved to strike Mr. Eggleston's addendum and errata sheets. ACE joined the motion. The parties submitted competing expert reports about whether FV-241 had indentations consistent with Brinell testing.

In the Eggleston Order, the magistrate judge granted this motion. The order permitted certain "technical" changes on Mr. Eggleston's errata sheets "relating to incorrect spelling, clarification, or changes where the reporter appears to have misunderstood Mr. Eggleston or made an error." *Id.* at 16,085-86. But it struck the remainder of Mr. Eggleston's errata sheets and his addendum as sham testimony because they made material changes that contradicted his deposition testimony. Sinclair did not file an objection to the magistrate judge's ruling in the district court.

46

### 2. **Reviewability of the Eggleston Order**

We first address whether we can review the Eggleston Order. Federal Rule of Civil Procedure 72(a) addresses magistrate judges' rulings on non-dispositive matters. The rule required Sinclair to object in the district court to the Eggleston Order within 14 days. Sinclair did not do so. ACE and the IVS Defendants argue Sinclair's failure to object divested us of jurisdiction over the Eggleston Order. Sinclair argues its failure could result only in non-jurisdictional waiver that we can excuse under an exception to the "firm waiver rule."[23] Reconciling conflicting circuit precedent, we agree with Sinclair.

ACE and the IVS Defendants rely on *SEC v. Merrill Scott & Associates, Ltd.*, 600 F.3d 1262 (10th Cir. 2010), our first published opinion squarely holding that a party's failure to object to a magistrate judge's non-dispositive ruling under Rule 72(a) "strips us of jurisdiction to review the [magistrate judge's] challenged order." *Id.* at 1269. But our court's earlier decisions established that a party's failure to object under Rule 72(a) is a non-jurisdictional waiver.

In *Niehaus v. Kansas Bar Association*, 793 F.2d 1159 (10th Cir. 1986), we said a party's failure to object to a magistrate judge's non-dispositive ruling resulted in waiver.

---

[23] Under the firm waiver rule, "a party who fails to make a timely objection to the magistrate judge's [ruling] waives appellate review of both factual and legal questions." *United States v. Deiter*, 890 F.3d 1203, 1211 n.5 (10th Cir. 2018) (quoting *Morales-Fernandez v. INS*, 418 F.3d 1116, 1119 (10th Cir. 2005)).

793 F.2d at 1164-65.[24]  *Niehaus* also referred to lack of "power" to hear an appeal, *id.*,[25]

but this came just after we said "appellants waived their right to appeal," *id.* at 1164.

And we concluded at the end of the opinion that "appellants waived their right to appeal."

*Id.* at 1165.[26]

If *Niehaus* was unclear about the consequences of failure to object, we resolved

that ambiguity in other decisions preceding *Merrill Scott & Associates*.  First, in *Moore v.*

*United States*, 950 F.2d 656 (10th Cir. 1991), although the appellant sought review of a

magistrate judge's findings and recommendations on a dispositive matter rather than a

non-dispositive ruling, we said, citing *Niehaus*, "Although we plainly have jurisdiction

over this appeal, we have adopted a firm waiver rule when a party fails to object to the

findings and recommendations of the magistrate."  *Id.* at 659 (citations omitted); *see*

---

[24] "Appellees argue that, by failing to file objections to the magistrate's report with the district court, appellants waived their right to appeal from the magistrate's order.  We agree."  *Niehaus*, 793 F.2d at 1164.  "We further hold that, by failing to object to the magistrate's order in the district court, appellants waived their right to appeal from that order."  *Id.* at 1165.

[25] "[F]ederal courts of appeals have held that appeals from magistrates' rulings must be to the district courts and that appellate courts are without power to hear appeals directly from orders of federal magistrates."  *Niehaus*, 793 F.2d at 1164-65.  "[W]e hold that, since appellants failed to object in the district court to the magistrate's order, we are without power to review that order on appeal."  *Id.* at 1165.

[26] We issued *Niehaus* when courts were "sometimes . . . profligate in [their] use of [jurisdictional terminology]."  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510 (2006).  Even if "power" in *Niehaus* meant jurisdiction, the Supreme Court has instructed courts to give "no precedential effect" to such "drive-by jurisdictional rulings."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) (identifying factors that make a jurisdictional ruling "drive-by").

48

*Haney v. Addison*, 175 F.3d 1217, 1219-20 (10th Cir. 1999) (similar); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (similar).  Second, and even more on point, in *Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695 (10th Cir. 1998), we said, "In [*Niehaus*], this court held that a party waives its right to appeal a magistrate judge's [non-dispositive order]" when it fails to object to it.  *Id.* at 706 (citing *Niehaus*, 793 F.2d at 1165).  Finally, in *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1114-15 (10th Cir. 2004), we cited *Moore* and recognized the firm waiver rule applies when a party fails to object to a magistrate judge's non-dispositive order.[27]

Breaking with the foregoing cases,[28] *Merrill Scott & Associates* held that a party's failure to object to a magistrate judge's non-dispositive ruling under Rule 72(a) divests us

---

[27] We have also regularly applied the firm waiver rule to Rule 72(a) rulings in unpublished decisions.  *E.g.*, *Derrick v. Standard Nutrition Co.*, 829 F. App'x 857, 863-64 (10th Cir. 2020) (unpublished); *Riviera Drilling & Expl. Co. v. Gunnison Energy Corp.*, 412 F. App'x 89, 91-92 (10th Cir. 2011) (unpublished); *Strope v. Collins*, 315 F. App'x 57, 61-62 (10th Cir. 2009) (unpublished).

But in some unpublished decisions, we have cited *Niehaus*'s "power" language to hold we lack jurisdiction when a party has failed to object to a magistrate judge's non-dispositive ruling.  *E.g.*, *Utah v Gollaher*, 804 F. App'x 947, 951 (10th Cir. 2020) (unpublished) (citing *Niehaus*, 793 F.2d at 1165).

[28] We have quoted *Niehaus*'s "power" language in only one published opinion, and we did so in a parenthetical without suggesting that a party's failure to object divests appellate jurisdiction.  *Pippinger v. Rubin*, 129 F.3d 519, 533 (10th Cir. 1997) (citing *Niehaus*, 792 F.2d at 1164-65).

In three other published decisions, we cited *Niehaus*'s Rule 72(a) analysis but did not resolve whether it concerned waiver or jurisdiction.  *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1064 (10th Cir. 2012); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Boyd Motors, Inc v. Emps. Ins. of Wausau*, 880 F.2d 270, 271 (10th Cir. 1989) (per curiam); *but see Moore*, 950 F.2d at 659 (interpreting *Boyd Motors, Inc.*, 880 F.2d at 271, as endorsing the firm waiver approach).

of jurisdiction to review it, 600 F.3d at 1269,[29] resulting in an intra-circuit conflict.  We

resolve that conflict based on our decisions in *Niehaus*, *Moore*, *Frontier Refining*, and

*Hill* predating *Merrill Scott & Associates*.  *See United States v. Rosales-Miranda*, 755

F.3d 1253, 1261 (10th Cir. 2014) ("[W]hen faced with an intra-circuit conflict, a panel

should follow earlier, settled precedent over a subsequent deviation therefrom." (quoting

*Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996))); *see also Crowson v. Wash.

Cnty., Utah*, 983 F.3d 1166, 1188-89 (10th Cir. 2020) (similar).  We thus hold the firm

waiver rule applies when a party fails to object to a magistrate judge's non-dispositive

ruling under Rule 72(a).[30]

---

[29] In *Merrill Scott & Associates*, 600 F.3d at 1269, we relied on *Hutchinson*, 105 F.3d at 566.  But we did not say in *Hutchinson* that a party's failure to raise a Rule 72(a) objection divests us of jurisdiction.

[30] This holding is consistent with the Supreme Court's statement in *Arbaugh*:
> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.  But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

546 U.S. at 515-16 (citation and footnote omitted).  Neither Rule 72(a) nor 28 U.S.C. § 636(b)(1)(A) contains jurisdictional terminology.

There appears to be a circuit split on this issue.  For example, the Second, Third, Sixth, Seventh, and Eleventh Circuits have treated a failure to object as non-jurisdictional waiver.  *Marcella v. Cap. Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46-47 (2d Cir. 2002); *Cont'l Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 251 n.9 (3d Cir. 1998); *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 406 (6th Cir. 2008); *Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 n.1 (7th Cir. 2012); *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1286 (11th Cir. 2003).  The D.C. Circuit—and perhaps the First Circuit—have held that the objection requirement is jurisdictional.  *CNPq—Conselho Nacional de Desenvolvimento Cientificoe Technologico v. Inter-Trade, Inc.*, 50 F.3d 56, 58-59 (D.C. Cir. 1995) (per curiam); *see Pagano v. Frank*, 983 F.2d 343, 346 (1st Cir. 1993).  The Ninth Circuit has held that a failure to

It follows that Sinclair may appeal the Eggleston Order unless it has waived its right to do so and no exception to waiver applies. One exception to the firm waiver rule is "when . . . the interests of justice require review." *Morales-Fernandez*, 418 F.3d at 1119 (citations and quotations omitted). Because the Eggleston Order was entered during a stay that appeared to prevent Sinclair from objecting, either Sinclair did not waive its right to appeal the Eggleston Order or it was entitled to appeal under the interests-of-justice exception.

On July 18, 2018, the district court entered a stay pending the resolution of numerous pending motions. The court "ORDER[ED] a stay in [the action] until [all pending motions] are resolved," except "that the parties shall continue to fully brief all motions which have been filed . . . ." App. at 16,070. Sinclair could reasonably have inferred that the stay order prohibited it from filing objections to the Eggleston Order, which was entered on July 24, 2018. The 14-day window to object under Rule 72(a) ended on August 7, 2018. The district court lifted the stay on June 11, 2019. Dist. Ct. Doc. 465. If the stay prohibited Sinclair from objecting to the Eggleston Order, Sinclair did not waive its right to appeal. Even if the stay did not prohibit Sinclair from objecting, we excuse Sinclair's waiver under the interests-of-justice exception because Sinclair could reasonably have interpreted the stay as prohibiting an objection.[31]

object results in forfeiture, not waiver. *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1173-75 & n.1 (9th Cir. 1996).

[31] During oral argument, the IVS Defendants argued that Sinclair should have known it could have objected to the Eggleston Order because they filed a motion for reconsideration on a different matter during the stay. *See* App. at 18,158 (September 20,

51

3. **Whether the Eggleston Order was Error**

Reaching the merits, we hold the magistrate judge did not abuse his discretion in striking Mr. Eggleston's retractions.

a. *Additional legal background*

Federal Rule of Civil Procedure 30(e) allows deponents to review their deposition testimony and make corrections to it:

> (e) Review by the Witness; Changes.
>
> (1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
>> (A) to review the transcript or recording; and
>>
>> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e). Under Rule 30(e), "[w]e do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony." *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002).[32]

---

2018 motion for reconsideration). But this argument is too conjectural, especially because their motion came long after the 14-day window for Sinclair to object to the Eggleston Order under Rule 72(a) had passed.

    [32] As one court explained:
> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith,"

We evaluate material changes made under Rule 30(e) by applying a test we developed in the context of sham affidavits. *See Burns v. Bd. of Cnty. Cmm'rs of Jackson Cnty.*, 330 F.3d 1275, 1281-82 (10th Cir. 2003). Both Rule 30(e) changes and affidavits that contradict previous testimony raise concern that the witness is trying to create a sham issue of fact. *Id.* at 1282. To determine whether an affidavit or a Rule 30(e) change is a sham, we apply the *Burns/Franks* factors:

1.  "whether the [deponent] was cross-examined during his earlier testimony";

2.  "whether the [deponent] had access to the pertinent evidence at the time of his earlier testimony or whether the [change to deposition testimony] was based on newly discovered evidence"; and

3.  "whether the earlier testimony reflects confusion which the [Rule 30(e) correction] attempts to explain."

*Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

b. *Analysis*

Sinclair argues the magistrate judge erred by applying the *Burns/Franks* factors to decide whether to exclude Mr. Eggleston's errata sheets and addendum to his first deposition testimony. It contends the *Burns*/*Franks* factors apply only to party deponents

---

then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.
*Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992) (quoted with approval in *Garcia*, 299 F.3d at 1242 n.5, and *BancFirst ex rel. Est. of M.J.H. v. Ford Motor Co.*, 422 F. App'x 663, 666 (10th Cir. 2011) (unpublished)).

and only to deposition testimony considered at summary judgment. But neither *Burns*, *Franks*, nor Rule 30(e) impose these limitations, and Sinclair tried to rely on Mr. Eggleston's retractions to oppose summary judgment. Sinclair also contends that the *Burns/Franks* factors do not apply because "objective" evidence supported Mr. Eggleston's proposed changes to his testimony. Aplt. Br. at 89-90. But the *Burns*/*Franks* factors account for changes to testimony without distinguishing whether they were based on objective or subjective evidence. *Burns*, 330 F.3d at 1281-82 (discussing *Franks*, 796 F.2d at 1237). We therefore apply the *Burns/Franks* factors and hold the magistrate judge did not abuse his discretion by excluding as a sham Mr. Eggleston's addendum and portions of his errata sheets that made material changes to his testimony.

All three factors support exclusion of Mr. Eggleston's retractions. First, Sinclair's counsel was present at Mr. Eggleston's first deposition and had an opportunity to cross-examine him, but chose not to. Second, FV-241 was not newly discovered evidence. It was remanufactured and installed on the Unit in 2006. Mr. Eggleston inspected it in 2009 after the fire. Sinclair contacted Mr. Eggleston about a year before his first deposition and had ample opportunity to give Mr. Eggleston access to it. App. at 6659. Third, Mr. Eggleston did not exhibit confusion during his first deposition. Our review of the transcript shows that he understood the questions and answered them confidently with details. He exhibited sound recall.

Sinclair's arguments to the contrary are not convincing. First, it argues FV-241 was "newly discovered evidence" because it was new to Mr. Eggleston. But, as discussed above, FV-241 was not newly discovered. And FV-241 was not new to Mr.

54

Eggleston; he showed familiarity with it in his first deposition. *E.g.*, *id.* at 6645 (recalling that FV-241 had a "similar construction" as its sister valve, FV-240); *id.* at 6652 (recalling that FV-240 and FV-241 had been "identified as long lead-time items" for which an immediate damage assessment was needed after the 2009 fire).

Second, Sinclair argues FV-241 was not available to Mr. Eggleston before his first deposition because showing it to him was logistically challenging. But the record shows the opposite: FV-241 was available, but Sinclair made no effort to show it to Mr. Eggleston. In fact, shortly after Mr. Eggleston's first deposition on July 21, 2017, Sinclair suggested that Mr. Eggleston see FV-241. *Id.* at 9162-65. On or around August 26, 2017, he drove from Dumas, Texas to Denver to view FV-241, which indicates he could have viewed FV-241 before his first deposition. *Id.* at 9162-67.

Third, Sinclair argues Mr. Eggleston must have been confused during his first deposition because Dr. Cornelissen, its metallurgy expert, did not find Brinell testing marks on FV-241 consistent with Mr. Eggleston's testimony. We disagree. Sinclair does not identify a single passage of Mr. Eggleston's first deposition that indicates confusion. As noted above, nor have we.

\* \* \* \*

Considering the *Burns/Franks* factors, we see no abuse of discretion in the magistrate judge's decision to strike the addendum and portions of the errata sheets to Mr. Eggleston's first deposition that retracted his testimony. We therefore affirm the Eggleston Order. Mr. Eggleston is bound to his admission that he knew in 2009 that

FV-241 was made from carbon steel.  We return to his testimony when we address

Sinclair's failure-to-warn claim based on the Metallurgy Theory.

### D.  *Claims Against ACE and the IVS Defendants*

We turn to Sinclair's claims against ACE and the IVS Defendants, which are the

fourth through seventh claims in the SAC.  They are:

4.  Breach of contract against ACE based on the Metallurgy Theory and OEM Specifications Theory;

5.  Negligence against ACE and the IVS Defendants based on the Metallurgy Theory and OEM Specifications Theory;

6.  Strict products liability against ACE and the IVS Defendants based on the Metallurgy Theory and OEM Specifications Theory; and

7.  Failure to warn against ACE and the IVS Defendants based on the Metallurgy Theory, and failure to warn that FirstVue could not verify that a valve was made from the correct metallurgy.

As we later explain, Sinclair conceded that if its claims under the Metallurgy

Theory fail, its claims under the OEM Specifications Theory also fail.  We thus address

the claims based on the Metallurgy Theory and FirstVue's limitations before turning to

the OEM Specifications Theory.

1.  **Claim 4 - Sinclair's Breach-of-Contract Claim Against ACE Based on the Metallurgy Theory**

Sinclair's fourth claim alleged in part that ACE breached the ACE Contract

because FV-241 was made from the incorrect metal.  The district court granted summary

judgment to ACE because Sinclair did not identify a provision of the ACE Contract that

was breached based on ACE's making FV-241 from carbon steel instead of stainless

steel.  We affirm.

The district court determined the ACE Contract consisted of three documents, App. at 18,309-11: (1) ACE's proposal to Sinclair's Dick Edwards for ACE to inspect 68 valves and then repair or replace them as necessary, *id.* at 9528-31; (2) ACE's purchase order for ACE to inspect and repair 59 valves, *id.* at 9646; and (3) ACE's quote to Sinclair for FV-241, *id.* at 3340-42. The court also concluded the ACE Contract was unambiguous and thus should be interpreted without resort to extrinsic evidence. *See id.* at 18,594-95.

On appeal, no party disputes that the ACE Contract consists of the aforementioned three documents and is unambiguous. We therefore focus on these three documents without resort to extrinsic evidence. *Sutherland*, 273 P.3d at 1095 (no extrinsic evidence when interpreting unambiguous contracts) (citing *Union Pac. Res. Co.*, 882 P.2d at 219-20).

No provision in the ACE Contract created a duty for ACE to determine whether FV-241's metallurgy was chemically appropriate for service in a hydrogen-rich environment and resistant to HTHA, and thus whether FV-241 was made from the right metal. ACE therefore did not breach the ACE Contract by providing a carbon steel valve to Sinclair.

Sinclair's arguments to the contrary are unpersuasive. Aplt. Br. at 62-65. First, it contends that ACE's proposal stated that FV-241 and other remanufactured valves would "be run through [Fisher FirstVue] to guarantee performance in the application specified." *Id.* at 63. Sinclair argues this implies that ACE and the IVS Defendants would check FV-241's resistance to HTHA. In its brief, Sinclair inserted the bracketed phrase

57

"[Fisher FirstVue]."  In fact, the proposal reads, "All new or Encore valves will be run through *Fisher's sizing program* to guarantee performance in the application specified."  App. at 9529 (emphasis added).  This language does not contemplate that ACE would assess FV-241's metallurgy for resistance to HTHA.[33]

Second, Sinclair points to language in ACE's proposal promising to "come to [Sinclair] with our best recommendation as to whether it will be more cost effective for [Sinclair] to go ahead and complete the repair . . . , rework or replace the trim . . . , or replace the valve with a newly remanufactured Encore valve . . . ."  *Id.* at 9528.  Sinclair argues the term "best recommendation" meant that ACE had to recommend a replacement valve with the correct metallurgy.  But the term "best recommendation" is used in the context of whether repair, rework, or replacement of a valve is most cost-effective.

Third, as it tried to do in district court, *id.* at 18,594-95, Sinclair asks us to consider extrinsic evidence to interpret the ACE Contract despite conceding the contract is unambiguous, Aplt. Br. at 63-64.  But Wyoming law bars us from considering extrinsic evidence when interpreting an unambiguous contract.  *Sutherland*, 273 P.3d at 1095 (citing *Union Pac. Res. Co.*, 882 P.2d at 219-20).

---

[33] As the district court stated, "Sinclair's argument would be like a smoke detector manufacturer promising its smoke detectors will 'guarantee performance' in detecting smoke, yet then having a consumer complain when the smoke detector does not detect a home invader."  App. at 18,596.

58

We agree with the district court that Sinclair failed to identify a contractual provision that ACE breached by providing a carbon steel valve. We thus affirm the district court's grant of summary judgment for ACE on Sinclair's fourth claim for breach of contract based on the Metallurgy Theory.[34]

## 2. Claims 5 and 6 - Sinclair's Negligence and Strict Products Liability Claims Against ACE and the IVS Defendants Based on the Metallurgy Theory

In the Omnibus Order, the district court granted summary judgment to ACE and the IVS Defendants on Sinclair's negligence and strict products liability claims that were based on the Metallurgy Theory. It reasoned that these claims required FV-241 to be defective, and that FV-241's metallurgy did not make it defective. Instead, FV-241 was the wrong product for its application. Applying Wyoming products liability law, we affirm.

### a. *Additional legal background*

In Wyoming, "[t]he requirement of showing a defect is one element common to every products liability case, whether it is brought on a theory of negligence . . . [or] strict

---

[34] Sinclair argues the district court erred in relying on this ground because ACE did not present it in its summary judgment motion. Aplt. Br. at 64; *see* App. at 13,660-82. But Sinclair's opposition to summary judgment placed this question at issue—that is, the duties created by the ACE Contract. App. at 17,641 (arguing that "[ACE] promised to utilize its expertise and perform services to make certain that each replacement control valve was properly selected in order to guarantee performance in the application specified" and to perform "a comprehensive analysis of each valve"); *see id.* at 17,645 (characterizing the ACE Contract as requiring ACE to provide its "technical expertise" for valve selection). Later, the parties extensively addressed at oral argument whether the ACE Contract required ACE to make FV-241 from the correct metal. *E.g.*, *id.* at 17,650, 19,092-93, 19,099-100, 19,101-03.

tort liability . . . ." *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 64 (Wyo. 1989) (citation omitted). "A defective product is a product which is not reasonably safe, or is unreasonably dangerous to the user or customer." *Campbell ex rel. Campbell v. Studer, Inc.*, 970 P.2d 389, 392 (Wyo. 1998) (quotations omitted). "The corollary of that statement is if a product is safe for normal use, it is not defective." *Loredo v. Solvay Am., Inc.*, 212 P.3d 614, 633 (Wyo. 2009) (citing *Campbell*, 970 P.2d at 392).

The Wyoming Supreme Court has held that when a product is simply the "wrong" one for its application, it is not defective. In *McLaughlin v. Michelin Tire Corp.*, it addressed whether Michelin tires installed on a mining company's Caterpillar scraper were defective or the wrong product for the application. 778 P.2d at 60-61. Cobre Tire ("Cobre"), a seller of Michelin tires, provided tires and tire maintenance for the mining company. *Id.* at 61-62. Cobre relied on Michelin's advice to choose tires for the scraper. *Id*. The tires caused the scraper to experience severe handling and control problems that eventually caused a bodily injury. *Id*. The court held the tires were not defective, but instead were the "wrong product" for the application. *Id.* at 64-65 (collecting decisions).

*McLaughlin* explained the proper claim against a seller or manufacturer that furnishes a wrong product is one for breach of the implied warranty of fitness for a particular purpose, not a products liability claim. If (1) a buyer relies on the "seller's [or manufacturer's] skill and judgment" to select a product for a particular purpose, (2) the seller or manufacturer knows about that reliance, and (3) "the product malfunctions when it is being used in the manner in which it was intended by the [buyer]," then the buyer may bring a claim for breach of the implied warranty of fitness for a particular purpose.

60

*Id.* at 66. In this context, the term "'defect' assumes an entirely different character than . . . under [the] negligence or strict liability [products liability] context." *Id.* "[A] defect exists not in the product itself but in the conduct of . . . furnishing a product that simply was the wrong one for the buyer's particular use." *Id.*

### b. *Analysis*

Sinclair concedes it must show FV-241 was defective to prevail on its negligence and strict liability claims against ACE and the IVS Defendants. Aplt. Bt. at 69. It has not identified a defect, so we affirm.

As noted, the Wyoming Supreme Court's decision in *Loredo* clarified that "if a product is safe for normal use, it is not defective." *Loredo*, 212 P.3d at 633 (citing *Campbell*, 970 P.2d at 392). In other words, FV-241 was not defective if the evidence showed it was safe for normal use.

ACE submitted evidence that FV-241 was safe for normal use. It points to deposition testimony by Dr. Cornelissen, Sinclair's metallurgy expert, suggesting that FV-241's metallurgy would have been acceptable if it had been placed into service outside a hydrogen-rich or corrosive environment, Aplee. ACE Br. at 33-34 (citing App. at 12,283), and to deposition testimony by Mr. Burns that about 90% of valves he handled at ACE were made from carbon steel, *id.* at 34 (citing App. at 3243). Meanwhile, Sinclair has made no effort to explain FV-241's normal use, let alone show it would be unsafe in normal use. The limited but uncontroverted evidence therefore shows that FV-241's metallurgy did not make it defective. Rather, it was the wrong product for its application in the Unit.

This reasoning is analogous to *McLaughlin*, in which the Wyoming Supreme Court noted that "[a] product is designed for specific uses, and if it is properly made but unsuitable for its intended use, its design is faulty." 778 P.2d at 77. Here, Sinclair has not shown that ACE or the IVS Defendants designed FV-241 for specific use in a corrosive environment. Rather, ACE and the IVS Defendants intended FV-241 to have a certain mechanical strength to withstand certain temperature and pressure conditions without regard to whether it would carry hydrogen. Because Sinclair submitted no evidence that FV-241 would have failed outside of hydrogen service, the district court correctly held that it was not defective.

Sinclair's two key arguments to the contrary are not convincing. First, Sinclair urges us to apply an alternate definition of product defect found in Section 2(b) of the *Restatement (Third) of Torts: Products Liability*. But in 2009, the Wyoming Supreme Court had an opportunity to adopt Section 2(b) because the state district court had applied it, but chose not to do so. *Loredo*, 212 P.3d at 630-31. In 1998, the Wyoming Supreme Court briefly discussed Section 2(b), but did not adopt it. *Campbell*, 970 P.2d at 392 n.1. Because the Wyoming Supreme Court has declined to adopt Section 2(b) on two occasions, we do not apply it here.

Second, Sinclair argues that under the ACE Contract, it hired ACE and the IVS Defendants to make "best recommendations" and to "assist Sinclair with its special purpose." Aplt. Br. at 70-71 (quoting App. at 18,330). But as we discussed earlier, Sinclair has not identified any provision of the ACE Contract that was breached by making FV-241 from carbon steel, and Sinclair uses the "best recommendations"

62

language out of context. Even if Sinclair had identified a contractual duty, it would not support finding a product defect. As *McLaughlin* explained, when a seller or manufacturer breaches its duty to apply its skill or judgment to select the right product, the breach gives rise to an implied warranty or breach-of-contract claim, not a product defect claim. *See* 778 P.2d at 65-67 (holding that such advice is relevant to an implied-warranty claim).

For these reasons, we agree with the district court that Sinclair has failed to show FV-241's carbon steel composition made it defective as opposed to the wrong product for its application. Because Sinclair's negligence and strict products liability claims depend on showing that FV-241 was defective and it has not done so, we affirm.

3. **Claim 7 - Sinclair's Failure-to-Warn Claim Against ACE and the IVS Defendants**

Sinclair's failure-to-warn claim against ACE and the IVS Defendants rested on their alleged breach of a duty to (a) warn that FV-241 was made from carbon steel and was vulnerable to HTHA (the Metallurgy Theory), and (b) warn that FirstVue could not verify the compatibility of a valve's metallurgy with chemical conditions. The district court rejected both claims in the Omnibus Order.

As for the Metallurgy Theory claim, we affirm because Sinclair knew before 2013 that FV-241 was made from carbon steel. No reasonable jury could find otherwise. As for the FirstVue claim, we affirm because Sinclair forfeited certain arguments in district court and waived them here by not arguing plain error.

63

a. *Sinclair knew before 2013 that FV-241 was made from carbon steel*

Sinclair knew before 2013 that FV-241 was made from carbon steel. This eliminated any duty ACE and the IVS Defendants may have had to warn Sinclair that FV-241 was made from carbon steel and thus vulnerable to HTHA. We thus affirm the district court's dismissal of Sinclair's failure-to-warn claim based on the Metallurgy Theory.

i. Additional legal background

Wyoming law recognizes that "if [a] product itself is not defective but may be unreasonably dangerous if it is used improperly, a plaintiff may show a 'defect' by establishing that the manufacturer failed to warn about dangers associated with the product." *Rohde v. Smiths Med.*, 165 P.3d 433, 441 (Wyo. 2007). Such a claim requires "determining whether a warning is necessary and/or whether the warnings provided were adequate." *Id.* at 441. The plaintiff must also show that the product caused its injury and that a warning would have changed its behavior and prevented the injury. *See Abraham v. Great W. Energy, LLC*, 101 P.3d 446, 456 (Wyo. 2004) (citing *Tune v. Synergy Gas Corp.*, 883 S.W. 2d 10, 14 (Mo. 1994)).

The duty to warn does not require a seller or manufacturer to warn a product user "of dangers of which the user is aware or of obvious dangers." *Parker v. Heasler Plumbing & Heating Co.*, 388 P.2d 516, 519 (Wyo. 1964); *see Sherman v. Platte Cnty.*, 642 P.2d 787, 789-90 (Wyo. 1982) (applying this principle more recently in the premises liability context).

64

ii. Analysis

The district court found that Sinclair knew about the risks of HTHA at all relevant times.[35]  App. at 18,331.  It thus concluded:  "[I]f Sinclair knew that FV-241 was made from carbon steel [before 2013], then ACE and IVS Defendants had no duty to warn Sinclair that it was nonconforming."  *Id.* at 18,333.  We agree.[36]  We further agree the evidence showed that Sinclair knew before 2013 that FV-241 was made from carbon steel.[37]

---

[35] Numerous Sinclair employees knew about the risk of HTHA.  *See* App. at 3107 (Sinclair's admission that "some employees" knew before 2004 about HTHA).  For example, before the 2009 fire, Mr. Eggleston learned about HTHA by studying for an industry certification.  *Id.* at 6885-86.  Other Sinclair inspectors also had industry certifications.  *Id.*; *see id.* at 3355 (testimony by John Bergeson, a Sinclair inspector, stating he knew about HTHA).  Paul Moote, Sinclair's Manager of Capital Projects, and Bill Walters, Sinclair's chief engineer for the project to move and convert the Unit, also knew about HTHA.  *Id.* at 2958, 14,018.  The specifications Fluor developed for the Unit and provided to Sinclair required FV-241 to be made from stainless steel because of HTHA.

[36] In its reply brief, Sinclair characterizes this conclusion as "a mistaken turn" but does not explain why.  Aplt. Reply Br. at 42.  "[W]e generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived."  *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019).  We also deem these issues waived due to inadequate briefing.  *See Burke*, 935 F.3d at 1014 ("[A]n appellant may waive an issue by inadequately briefing it.").

[37] In its opening brief, Sinclair argues the district court should not have relied on Mr. Eggleston's first deposition testimony to conclude Sinclair knew before 2013 that FV-241 was made from carbon steel.  Aplt. Br. at 73-78.  But Sinclair does not contest that its failure-to-warn claim fails if it had such knowledge.  *See id.* at 78 (even appearing to acknowledge that Sinclair's knowledge "that FV-241 was manufactured from carbon steel before the Fire" "could have obviated the need for a warning").

First, Sinclair received specification sheets from ACE in February and April 2006 stating that FV-241's "Material" was "WCB Carbon STL Cast," or cast carbon steel. *Id.* at 3341 (specification sheet sent in February); *id.* at 3394 (specification sheet sent in April); *id.* at 3103 (Sinclair's admission that it received these documents). Before the district court, Sinclair argued that Mr. Edwards, "[its] employee who received that specification sheet[,] was only qualified to assess it for specifications, not for metallurgy." *Id.* at 18,333 (citing Sinclair's argument, App. at 9277). But as the district court observed in the Omnibus Reconsideration Order, *id.* at 18,602, Sinclair cited no evidence showing Mr. Edwards was unqualified, *id.* at 9277-78 & n.84 (citing App. at 10,211-15). And the specification sheets plainly said FV-241 was made of carbon steel.

Second, when Sinclair received FV-241 from IVS in 2006, the valve's actuator tag, flanges, and valve body carried markings indicating it was made from carbon steel. *Id.* at 2827 ("Incident Investigation" document, indicating that FV-241's flange was labeled as carbon steel); *id.* at 17,666 (Sinclair's admission). Before the district court, Sinclair argued its employees who received FV-241 from IVS and turned it over to A&B for installation would not have known what the markings meant. *Id.* at 18,333 (citing Sinclair's argument, App. at 17,666). But as the district court observed in the Omnibus Reconsideration Order, *id.* at 18,602, Sinclair cited no evidence to support this argument, *id.* at 17,666.

Third, Mr. Eggleston testified he knew in 2009 that FV-241 was made from carbon steel. His recollection of other details about FV-241 reinforced this admission.

66

He remembered that Sinclair had identified FV-241 as a "long lead-time item[]" for replacement purposes. *Id.* at 6643, 6651-53. He recalled that FV-241 had "a similar construction" to its sister valve, FV-240. *Id.* at 6645. His recollection of FV-240 and FV-241 was noteworthy because the Unit had several dozen valves. *Id.* at 9513-14 (process information spreadsheet indicating the Unit had about 80 valves); *id.* at 9528 (ACE's proposal to Sinclair, contemplating work relating to 68 valves). He testified that if he saw the markings on FV-241, he would have understood the markings as indicating it was made from carbon steel. *Id.* at 6647.[38]

Sinclair's attempts to downplay this testimony fail. It contends that even though Mr. Eggleston testified his Brinell testing in 2009 would have left marks on four areas of FV-241, Dr. Cornelissen, Sinclair's metallurgy expert, found only one "definitive" Brinell testing mark when he examined FV-241 after the 2013 explosion and fire. *Id.* at 6646, 6667 (Eggleston testimony); *id.* at 9232, 9234 (Cornelissen testimony). But Dr. Cornelissen's testimony addressed whether Mr. Eggleston correctly performed Brinell testing.[39] It did not directly address whether Mr. Eggleston knew FV-241 was made from carbon steel.

---

[38] In its reply brief, Sinclair argues that ACE and the IVS Defendants must show Sinclair knew FV-241 was carbon steel in the year 2006, not just that Sinclair knew sometime before the 2013 fire and explosion. Aplt. Reply Br. at 41. Once again, we deem this argument waived because it was made for the first time on appeal in Sinclair's reply brief. *Leffler*, 942 F.3d at 1197. And in any case, we have described the evidence showing Sinclair knew in 2006.

[39] The evidence shows that Mr. Eggleston performed Brinell testing on FV-241. He testified that at a meeting shortly after the 2009 fire, he discussed the need to perform Brinell testing on FV-241 with other staff. App. at 6648, 6650-51. He testified that he

Further, Sinclair argues it can rely on Mr. Eggleston's second deposition, wherein he explained why he tried to retract his earlier testimony. Aplt. Br. at 77. But as the district court correctly held in the Omnibus Reconsideration Order, Mr. Eggleston's second deposition testimony is inadmissible for the same reason his Rule 30(e) changes are inadmissible. App. at 18,601-02.

Finally, Sinclair contends, without pointing to evidence, that Mr. Eggleston's testimony cannot be imputed to Sinclair. Aplt. Br. at 78. But Mr. Eggleston was Sinclair's inspection supervisor and responsible for inspecting the Unit after the 2009 fire. "[A] corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 n.9 (10th Cir. 2018) (quoting *W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005)); *Grayson v. Williams*, 256 F.2d 61, 66 (10th Cir. 1958) ("[A]dmissions made by an agent while acting in the scope of his employment and concerning the subject matter of his employment are binding on the principal."); *see* Fed. R. Evid. 801 advisory committee's note to 1972 proposed rules (citing *Grayson*, 256 F.2d 61); *Am. Nat'l Bank of Powell v. Foodbasket*,

---

performed the test "in the field where [it] normally resides in operation." *Id.* at 6643. After the 2013 fire and explosion, Mr. Eggleston told others about having performed Brinell testing on FV-241 in 2009. *Id.* at 6659-60.

Also, the IVS Defendants' expert witness, Dr. Michael E. Stevenson, observed at least one definitive Brinell testing indentation and several potential ones on FV-241. *Id.* at 6583-84, 6587-93. He also noted that Brinell testing indentations can be damaged by age, mechanical damage, or thermal damage. *Id.* at 6583.

497 P.2d 546, 547-48 (Wyo. 1972) (agent's knowledge generally may be imputed to principal).

*    *    *    *

The summary judgment record shows Sinclair knew before 2013 that FV-241 was made from carbon steel.  No reasonable jury could conclude otherwise.  This eliminated any duty for ACE and the IVS Defendants to warn that FV-241 was made from carbon steel and thus vulnerable to HTHA.  We therefore affirm the district court's grant of summary judgment on Sinclair's failure-to-warn claim based on the Metallurgy Theory.[40]

### b.  *Failure-to-warn claim based on FirstVue's limitations*

In the Omnibus Order, the district court held that because Sinclair was not a user or consumer of FirstVue, it lacked standing to assert failure-to-warn claims about FirstVue.  App. at 18,335-36.  On appeal, Sinclair argues the court erred because ACE and the IVS Defendants owed a duty of care to all persons within the zone of risk.  Aplt.

---

[40] Sinclair argues liability should be imposed under Comment e to Section 5 of the *Restatement (Third) of Torts:  Products Liability*.  *See* Aplt. Reply Br. at 40 (mistakenly citing Comment b but making an argument based on Comment e).  Comment e states: "When the component seller is substantially involved in the integration of the component into the design of the integrated product, the component seller is subject to liability when the integration results in a defective product and the defect causes harm to the plaintiff." Apart from the fact that Wyoming courts have not adopted this section of the *Restatement*, Comment e does not help Sinclair because it integrated the component (FV-241) into the product (the Unit), making the product defective.  *See* App. at 18,331 (district court's factual finding that Sinclair does not contest on appeal).  All the cases cited in the Reporters' Note to Comment e contemplate failure-to-warn claims brought against a component seller by a plaintiff that was not involved in integrating the component.

69

Br. at 79-80. But Sinclair forfeited this argument by failing to raise it before the district court, and waived it here by failing to argue plain error on appeal.

i. Legal standards

Under Wyoming law, one owes a duty of care to those in the zone of foreseeable risk. *Glenn v. Union Pac. R. Co.*, 262 P.3d 177, 193-94 (Wyo. 2011) (collecting cases). But a manufacturer is strictly liable only to the consumers and users of its products. *Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334, 341-42 (Wyo. 1986) (expressly adopting Section 402A of the *Restatement (Second) of Torts* as Wyoming law). In general, the class of plaintiffs that may maintain a negligence claim is larger than the class that may sue for strict liability.

ii. Analysis

Sinclair argues the district court erred by holding that its failure-to-warn claim failed because it was not a consumer or user of FirstVue. It contends that because its failure-to-warn claim is a negligence claim, ACE and the IVS Defendants owed a duty of care to all those in the zone of foreseeable risk associated with FirstVue. But Sinclair forfeited this argument by failing to make it in district court.

We trace Sinclair's forfeiture to its imprecise pleading and briefing on summary judgment. In the SAC, it vaguely labeled its seventh claim for relief as "failure to warn." App. at 1737. It did not explain whether this claim was for negligence or strict products liability. In their motion for summary judgment, the IVS Defendants understood that Sinclair's failure-to-warn claim was for strict products liability instead of negligence. They cited Section 402A of the *Restatement (Second) of Torts*, which concerns strict

70

products liability claims, and argued that Sinclair did not have standing to bring its failure-to-warn claim because Sinclair was neither a user nor a consumer of FirstVue. *Id.* at 2189-90. In its opposition, Sinclair did not clarify whether its FirstVue failure-to-warn claim was based on negligence, nor explain why it had standing to bring a failure-to-warn claim as a non-user and non-consumer of FirstVue under either a negligence or strict liability theory. *Id.* at 9260, 9293-95 (opposition).[41] The district court applied Section 402A, noted that Sinclair had failed to respond to the IVS Defendants' argument, and held that Sinclair lacked standing to bring a failure-to-warn claim about FirstVue's limitations. *Id.* at 18,335-36 (portion of Omnibus Order noting Sinclair's failure to respond).

Sinclair now insists that its failure-to-warn claim regarding FirstVue is a negligence claim and argues it has standing despite being a non-user and non-customer of FirstVue. Aplt. Br. at 79-80. But Sinclair forfeited that argument in district court and has waived it here by failing to argue that the district court plainly erred by failing to construe its claim as a negligence claim. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127-30 (10th Cir. 2011).

We therefore affirm the district court's grant of summary judgment to ACE and the IVS Defendants on Sinclair's failure-to-warn claim based on FirstVue's limitations.

\* \* \* \*

---

[41] In its opposition to a later summary judgment motion by ACE, Sinclair labeled its seventh claim for failure to warn as a negligence claim. App. at 17,649. But Sinclair never explained why it had standing as a non-user and non-consumer of FirstVue.

71

We affirm the district court's grant of summary judgment to ACE and the IVS Defendants on Sinclair's failure-to-warn claims based on the Metallurgy Theory and FirstVue's limitations.

4. **Sinclair's Remaining Claims Based on the OEM Specifications Theory**

Sinclair's remaining claims are based on the OEM Specifications Theory.[42]  In the IVS Second MSJ Order, the district court accepted Sinclair's concession that FV-241's failure to meet Fisher's OEM specifications for wall thickness would not alone have caused FV-241's failure, App. at 18,848, because "the wall thickness issue only affected the timing of the failure," *id.* at 18,676 (Sinclair's concession).  In other words, Sinclair conceded that if its claims based on the Metallurgy Theory fail, its claims based on the OEM Specifications Theory also fail.

Based on this concession, the district court granted summary judgment to ACE and the IVS Defendants on Sinclair's remaining claims based on the OEM Specifications Theory.  *Id.* at 18,848-51.  On appeal, Sinclair provides no reason why it is not bound by its concession.  Because we agree with the district court's conclusion that Sinclair's claims based on the Metallurgy Theory are not viable, we affirm the district court's grant of summary judgment on Sinclair's claims based on the OEM Specifications Theory.

---

[42] The remaining claims are:  (1) a breach-of-contract claim against ACE; (2) a negligence claim against the IVS Defendants; and (3) a strict products liability claim against the IVS Defendants.  App. at 18,290-91; *see id.* at 18,598 ("Against the party not bound, Sinclair can pursue its tort theories.").

72

## III. **CONCLUSION**

Although our analysis diverges from the district court's in some respects, we affirm the orders dismissing or granting summary judgment on all of Sinclair's claims and granting summary judgment in favor of the CB&I Defendants' indemnity counterclaim.